# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MIGUEL GARCIA, *et al.*,

        *Plaintiffs*,

v.

R. ALEXANDER ACOSTA, *et al.*,

        *Defendants.*

Civil Action No. 18-1968 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, permits employers to hire temporary foreign workers "to perform agricultural labor or services" in the United States. 8 U.S.C. § 1101(a)(15)(H)(ii)(a). To hire a temporary foreign worker under this program—known at the H-2A visa program—an employer must petition the Secretary of Labor "for a certification that [1] there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed," to perform the work, and, "[2] the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed." *Id.* § 1188(a). As required by the INA, the Secretary of Labor has promulgated implementing regulations to govern the "process by which the Department of Labor" issues such certifications. 20 C.F.R. § 655.103(a); *see also id.* § 655, subpart B (regulations governing H-2A visa program). These regulations require, among other things, that "employer[s] . . . offer, advertise in [their] recruitment, and pay a wage that is the highest of" four wage measures specified in the regulations. *Id.* § 655.120(a); *see also id.* § 655.122(l)(1). At issue in this case is one of those four measures known as "the prevailing hourly wage." *Id.* § 655.120(a).

Plaintiffs—four agricultural workers and a farmworkers labor union—bring this action against the Secretary of Labor and the Department of Labor (collectively, "the Secretary") under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* They allege that the Secretary has a policy and practice of certifying employers to hire H-2A workers at wages lower than the applicable prevailing wages, *see, e.g.*, Dkt. 1 at 15 (Compl. ¶ 57), and they challenge the grant of five specific certifications, *see id.* at 14–15 (Compl. ¶¶ 51–53). Plaintiffs contend that the Secretary's policy and practice of granting certifications that fail to comply with the existing regulations constitutes a *de facto* amendment to the regulations, without observance of the APA's notice and comment procedures, and that this policy and practice and the Secretary's decision to issue the five specific certifications is arbitrary and capricious and contrary to the Department's own regulations.

The matter is before the Court on Defendants' motion to dismiss for lack of subject-matter jurisdiction, or, in the alternative, to transfer the case to the U.S. District Court for the Northern District of Illinois or to stay the case. Dkt. 9. Defendants argue that the case should be dismissed because Plaintiffs' challenges to the five specific certifications are moot and their policy and practice claims are unripe. *Id.* at 17–22. If the Court declines to dismiss the action, Defendants request that the Court transfer the case to the Northern District of Illinois—where the Department of Labor's Chicago National Processing Center is located—or, at the very least, stay the case to provide the Secretary with time to initiate a rulemaking to "modernize" the H-2A visa program. *Id.* at 22–26. For the reasons explained below, the Court will grant in part and deny in part Defendants' motion to dismiss. The Court will grant the motion to dismiss with respect to Plaintiffs' wrongful certification claims and will deny the motion with respect to Defendants'

policy and practice claims. The Court will also deny Defendants' motion to transfer or to stay the case.

## I. BACKGROUND

### A. Statutory and Regulatory Background

Congress created the H-2A visa program to address temporary shortages of agricultural labor in the United States. *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(a). The program, named after the INA provision authorizing its existence, is jointly administered by the Department of Labor and the United States Citizenship and Immigration Services, a component of the Department of Homeland Security. *See Mendoza v. Perez*, 754 F.3d 1002, 1007 (D.C. Cir. 2014). Before hiring H-2A workers, an employer must obtain a certification from the Secretary of Labor establishing that (1) there is a shortage of U.S. workers who are "able, willing, and qualified" to "perform the labor or services" at issue and that (2) "the employment of [foreign workers] in such labor or services will not adversely affect the wages and working conditions" of similarly situated U.S. workers. 8 U.S.C. § 1188(a)(2); *see also* 20 C.F.R. § 655.103(a). "Only after obtaining [the Secretary's] certification may the employer petition the United States Citizenship and Immigration Services to classify a specific foreign worker as an H-2A temporary worker." *Mendoza*, 754 F.3d at 1007.

The Secretary has promulgated regulations governing the H-2A visa certification process. *Id.* at 1008 (citing 20 C.F.R. § 655, subpart B). Those regulations assign the authority to issue temporary foreign labor certifications to the Department of Labor's Office of Foreign Labor Certifications ("OFLC"). *See* 20 C.F.R. § 655.101 ("The determinations [shall be] made by the OFLC Administrator who, in turn, may delegate this responsibility to designated staff members; e.g., a Certifying Officer (CO)."). To "ensure that the employment of H-2A workers does not

'adversely affect the wages and working conditions' of domestic workers," the regulations

specify "minimum wages and working conditions" for jobs under the H-2A visa program.

*Hispanic Aff. Project v. Perez*, 141 F. Supp. 3d 60, 64 (D.D.C. 2015) (citing *Mendoza*, 754 F.3d

at 1008)); *see also* 20 C.F.R. § 655.122. The regulations were last amended in 2016. *See, e.g.*,

20 C.F.R. § 653.501 (effective Oct. 18, 2016).

At issue in this case is the "Offered Wage Rate" provision of the regulations, which

requires employers participating in the H-2A visa program to "offer, advertise in [their]

recruitment, and pay" workers the highest of four wages:

> [1] the [Adverse Effect Wage Rate] ("AEWR")], [2] the prevailing hourly wage
> or piece rate, [3] the agreed-upon collective bargaining wage, or [4] the Federal
> or State minimum wage, except where a special procedure is approved for an
> occupation or specific class of agricultural employment.

20 C.F.R. § 655.120(a); *see also id.* § 655.161(a) (prohibiting OFLC from certifying an employer

who is not in compliance with the Offered Wage Rate provision). Three of the wage measures

are not at issue in this case: the "AEWR," which is defined as the "annual weighted average

hourly wage for field and livestock workers (combined) in the [s]tates or regions" for which it is

calculated (as reported by the U.S. Department of Agriculture), *id.* § 655.103(b), the "agreed-

upon collective bargain wage," and "[f]ederal or [s]tate minimum wage," neither of which is

defined.

This case focuses on the remaining wage measure: "the prevailing hourly wage." The

regulations define "prevailing wage" to mean the "wage established pursuant to 20 C.F.R. [§]

653.501(d)(4)." *Id.* § 655.103(b). Prior to the 2016 amendments, § 653.501(d)(4) provided that

"[n]o local office shall place a job order seeking workers to perform agricultural . . . processing

into interstate clearance unless . . . [t]he wages and working conditions offered are not less than

the prevailing wages and working conditions among similarly employed agricultural workers in

the area of intended employment." 20 C.F.R. § 653.501(d)(4) (2016). What was once § 653.501(d)(4), however, has now been relocated to § 653.501(c)(2)(i). That provision now asserts, in relevant part, that state workforce agencies ("SWAs") must ensure that "[t]he wages and working conditions offered are not less than the prevailing wages and working conditions among similarly employed farmworkers in the area of intended employment or the applicable Federal or State minimum wage, whichever is higher." 20 C.F.R. § 653.501(c)(2)(i) (2019).

## B.    Factual Background

Plaintiffs are four U.S. agricultural workers and an agricultural labor organization. Dkt. 1 at 3 (Compl. ¶ 5). The individual plaintiffs—Miguel Garcia, Alberto Olvera Gomez, Jose Botella Avila, and Gerard Princilus—are lawful permanent residents of Texas, Arizona, and Florida, who travel to "agricultural businesses across the country" to obtain "temporary agricultural employment." *Id.* at 4–5 (Compl. ¶¶ 8–12). Each alleges that he would have sought and accepted work from at least one of the five employers whose certifications are at issue if that employer had paid the "prevailing wage," instead of the lower wage certified by the Secretary. *Id.* at 10–13 (Compl. ¶¶ 33, 36, 39, 42, 45). Plaintiff Farm Labor Organizing Committee ("FLOC") is "a farmworker labor union, with nearly 8,000 members throughout the eastern half of the United States," "[m]any" of whom are "Mexican nationals participating in the H-2A guestworker program." *Id.* at 5 (Compl. ¶ 13). FLOC alleges that its members "are being paid a wage lower than that required by the Offered Wage Rate provision" of the H-2A regulations. *Id.* Together, the individual plaintiffs and FLOC challenge the Secretary's "policy and practice" of disregarding the "prevailing wage" when certifying H-2A employers, and they challenge five specific certifications, which, they say, permitted the employers to "offer[] a wage rate lower

than the prevailing wage," in violation of the Offered Wage Rate provision. *Id.* at 3 (Compl. ¶ 4).

1.      *Plaintiffs' Policy and Practice Claims*

The complaint asserts five claims under the APA, three of which concern the Secretary's alleged "policy and practice" of disregarding the "prevailing wage" rate when issuing H-2A certifications. Dkt. 1 at 15–17 (Compl. ¶¶ 57–65) (hereinafter the "policy and practice claims"). Plaintiffs allege that the Secretary has adopted "a policy of deferring to surveys conducted by . . . SWAs . . . to determine the prevailing wage" and that, "[w]here an SWA does not conduct a wage survey, or where the SWA issues 'no finding' as to a prevailing wage rate," the Secretary "grants temporary employment certifications without determining the prevailing wage and without applying the prevailing wage element of the Offered Wage Rate provision." *Id.* at 8–9 (Compl. ¶¶ 27–28). As a result, in the absence of an SWA's determination of the "prevailing wage," the Secretary permits employers to pay workers the highest of three wages: "the legal state or [f]ederal minimum, the agreed-upon collective bargaining wage rate[,] or the [AEWR]." *Id.* (Compl. ¶ 29). Plaintiffs allege that, "[p]ursuant to this policy and practice, [the Secretary] has granted hundreds of temporary labor certifications where the offered wage rate is lower than the prevailing wage rate, as calculated by [the Department of Labor's] Bureau of Labor Statistics based on its [Occupational Employment] [S]urvey." *Id.* (Compl. ¶ 30).

Plaintiffs allege (1) that the Secretary's "policy and practice" is "contrary to the Offered Wage Rate provision," *id.* at 15 (Compl. ¶ 57); (2) that the "policy and practice" is "arbitrary and capricious because it reflects a failure to consider an important, relevant, and statutorily-mandated factor," *id.* at 16 (Compl. ¶ 61); and (3) that the "policy and practice . . . constitutes a de facto rule" allowing the Secretary "to grant temporary employment certifications without

regard to the prevailing wage," *id.* at 16–17 (Compl. ¶¶ 62–63), which the agency adopted

without "comply[ing] with the rulemaking requirements of the APA," *id.* at 17 (Compl. ¶ 64).

By way of relief, Plaintiffs ask the Court to declare that the Secretary's policy and practice

"violates the APA" and to enjoin the Secretary from granting H-2A certifications that do not

comply with "the wage requirements of the INA and its implementing regulations" or that

"offer[] a wage lower than the prevailing wage rate." *Id.* at 17–18 (Compl. Prayer).

2.  *Plaintiffs' Wrongful Certification Claims*

Plaintiffs' remaining two claims challenge the Secretary's certification of five employers

for the 2018 season: McCabe Agribusiness, Inc. (Montana), Peri & Sons Farms, Inc. (Nevada),

Daniels Produce, LLC (Nebraska), United Agronomy, LLC (North Dakota), and Del Valle

Fresh, Inc. (South Carolina). *Id.* at 9–12 (Compl. ¶¶ 31, 34, 37, 40, 43) (hereinafter "the

wrongful certification claims"). Plaintiffs allege that each of these five employers applied for a

temporary foreign labor certification with a wage that was lower than the "prevailing wage," "as

calculated by the Occupational Employment Survey ["OES"] and published on the OFLC's own

website." *Id.* They further allege that, "[b]y approving each of the five job orders discussed

above, [the Secretary] has both caused lower wages to be offered for those jobs and adversely

affected the wages for U.S. workers in other jobs in those industries and states." *Id.* at 13

(Comp. ¶ 46). The individual plaintiffs allege that the lower wages deterred them from applying

for and accepting these jobs—for which they were otherwise qualified—and that they would

have applied if offered the prevailing wage. *Id.* at 10–13 (Compl. ¶¶ 33, 36, 39, 42, 45); *see also*

Dkt. 11-1 at 2 (Avila Decl. ¶ 8); Dkt. 11-2 at 2 (Gomez Decl. ¶ 8); Dkt. 11-3 at 2 (Princilus Decl. ¶ 8).

Plaintiffs allege that the Secretary's "grant of each of the five wrongful certifications . . . was contrary to law," Dkt. 1 at 14 (Compl. ¶ 51), and arbitrary and capricious, *id.* at 15 (Compl. ¶ 54). By way of relief, Plaintiffs ask the Court to declare the Secretary "violated the APA by granting the five wrongful certifications" and to "declare unlawful and [to] set aside the wrongful certifications" themselves. *Id.* at 17 (Compl. Prayer).

## C.    Procedural Background

Plaintiffs filed suit in August 2018. Dkt. 1. In October 2018, Defendants moved to dismiss this action for lack of subject-matter jurisdiction, Dkt. 9-1 at 17–22, and moved, in the alternative, to transfer the case to the U.S. District Court for the Northern District of Illinois, *id.* at 22–24, or to stay the case pending issuance of a proposed rule, "which could substantially affect the entire nature of the case," *id.* at 25. Before the Court could rule on the motion, Defendants filed a notice of administrative action informing the Court that the Department had "submitted its Notice of Proposed Rulemaking [("NPRM")], regarding the H-2A non-immigrant visa program . . . to the Office of Information and Regulatory Affairs ('OIRA') on January 28, 2019." Dkt. 20 at 1. The ninety-day period for OIRA's review was set to expire on April 28, 2019, subject to a "one-time" extension of "no more than 30 days." *Id.* To date, the Secretary has yet to publish the contemplated NPRM, nor has he provided the Court with an update regarding its status.

## II.  ANALYSIS

### A.    Motion to Dismiss

Defendants contend that the Court lacks subject-matter jurisdiction because Plaintiffs' wrongful certification claims are moot and because Plaintiffs' challenges to the Secretary's policy and practice are unripe.  Dkt. 9-1 at 17–22.  "At the motion to dismiss stage, courts assess justiciability based in part on 'the theory of injury presented in the complaint' and 'the facts alleged in support of the claim.'"  *Reid v. Inch*, 920 F.3d 828, 833 (D.C. Cir. 2019) (quoting *Haase v. Sessions*, 835 F.2d 902, 907 (D.C. Cir. 1987)).  Because the Court must ensure that it has jurisdiction, however, it may, when appropriate, consider any "undisputed facts evidenced in the record" and may also resolve any factual disputes necessary to determine its jurisdiction. *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).  The party seeking dismissal on grounds of mootness bears the initial burden, but, once that party has established that a claim is moot, the burden shifts to "the opposing party . . . to prove that a mootness exception applies." *Reid*, 920 F.3d at 832.  Because the plaintiff bears the burden of establishing that the Court has jurisdiction, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), and because "'[r]ipeness is a justiciability doctrine' that is 'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction,'" *Devia v. Nuclear Regulatory Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007) (quoting *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807–08 (2003)), the plaintiff bears the burden of establishing that each claim is ripe for adjudication, *Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 873 F. Supp. 2d 363, 368 (D.D.C. 2012) (citing *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48 (D.C. Cir. 1999)).

For the reasons explained below, the Court will grant the Secretary's motion to dismiss Plaintiffs' wrongful certification claims as moot but will deny his motion to dismiss Plaintiffs' policy and practice claims as unripe.

      1.     *Plaintiffs' Wrongful Certification Claims Are Moot*

"To invoke federal jurisdiction, a plaintiff must [have] a 'personal stake' in the outcome of the action," and that personal stake "'must be extant at all stages of review, not merely at the time the complaint is filed.'"  *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 (2018) (first quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013); then quoting *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975)).  In general, a claim becomes moot and falls "outside the jurisdiction of the federal courts" if the required personal stake—or concrete interest—ceases to exist at any point in the litigation.  *Id*.  That rule, however, is subject to at least two exceptions, including an exception for claims that are "capable of repetition, yet evading review."  *Spencer v. Kemna*, 523 U.S. 1, 17 (1998).  The question posed here is whether that exception applies to Plaintiffs' wrongful certification claims.

It is undisputed that the five specific certifications at issue have expired.  *See* Dkt. 10 at 13 (acknowledging that the latest certification expired on December 1, 2018).  The Court, accordingly, cannot provide any meaningful relief with respect to those five certifications—in other words, an order setting them aside at this point would have no practical consequence.  Plaintiffs do not dispute this premise but instead argue that their wrongful certification claims fall within the capable-of-repetition-yet-evading-review exception to the mootness doctrine.  That exception applies when "(1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again."  *Spencer*, 523 U.S. at 17

(alterations in original) (internal quotation marks and citation omitted). Although the "annual nature of the certification process would normally lead to the conclusion that any challenge would evade review, '[a] litigant cannot credibly claim his case "evades review" when he himself has delayed its disposition.'" *Grass Works Lawn Care*, No. 18-cv-1581, 2019 WL 1981087, at *6 (D.D.C. May 3, 2019) (quoting *Armstrong v. FAA*, 515 F.3d 1294, 1296 (D.C. Cir. 2008)). That is the circumstance here, and it precludes Plaintiffs from relying on the capable-of-repetition-yet-evading-review exception.

The case law in this Circuit is clear. A plaintiff seeking to invoke the exception must "make a full attempt to prevent his case from becoming moot, an obligation that includes filing for preliminary injunctions and appealing denials of preliminary injunctions." *Newdow v. Roberts*, 603 F.3d 1002, 1009 (D.C. Cir. 2010); *see also Grass Works Lawn Care*, 2019 WL 1981087, at *6 (concluding challenge was moot where plaintiff "waited four months . . . to file suit and never timely requested a preliminary injunction or other expedited relief"); *PETA v. U.S. Fish and Wildlife Serv.*, 59 F. Supp. 3d 91, 98 (D.D.C. 2014) (concluding challenge was moot where plaintiff failed to move for preliminary relief). "The capable-of-repetition doctrine is not meant to save mooted cases that may have remained live but for the neglect of the plaintiff." *Newdow*, 603 F.3d at 1009.

Here, Plaintiffs failed to make a "full attempt" to obtain timely review of their wrongful certification claims. *Id.* Although the Secretary issued the first of the five wrongful certifications on February 12, 2018, *see* Dkt. 10 at 13, Plaintiffs waited until August 23, 2018, to file suit—more than six months later. Plaintiffs, moreover, never moved for preliminary relief and never requested expedited briefing, even though two of the certifications were due to expire *before* briefing on the motion to dismiss was complete and all five certifications were due to

11

expire within two weeks of that deadline. *See id.* Because Plaintiffs "cannot credibly claim [that their] case 'evades review' when [they themselves] ha[ve] delayed its disposition," *Grass Works Lawn Care v. Acosta*, 2019 WL 1981087, at \*6 (quoting *Armstrong*, 515 F.3d at 1296), the Court will dismiss their wrongful certification claims as moot.

## 2. *Plaintiffs' Policy and Practice Claims Are Ripe*

That, however, does not end Plaintiffs' suit. "It is well-established that[,] if a plaintiff challenges both a specific agency action and the *policy* that underlies that action, the challenge to the policy is not necessarily mooted merely because the challenge to the particular agency action is moot." *City of Houston v. Dep't of Hous. and Urban Dev.*, 24 F.3d 1421, 1428 (D.C. Cir. 1994) (citing *Payne Enters. v. United States*, 837 F.2d 486 (D.C. Cir. 1988); *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86 (D.C. Cir. 1986)). To the contrary, even "if a plaintiff's specific claim has been mooted, it may nevertheless seek declaratory relief forbidding an agency from imposing a disputed policy in the future, so long as the plaintiff has standing to bring such a forward-looking challenge and the request for declaratory relief is ripe." *Id.* at 1429. The Court must assess, as a result, whether Plaintiffs' policy and practice claims are justiciable. For present purposes, the Secretary does not dispute that the Department of Labor has a policy and practice of ignoring the prevailing wage or deferring to "no finding" reports by SWAs to calculate the prevailing wage when issuing H-2A certifications, nor does he dispute that Plaintiffs have a concrete and redressable interest in challenging that policy and practice. Instead, he argues that Plaintiffs' claims are "prudentially unripe" because the Department's rulemaking "may soon alter the H-2A program's wage methodology." Dkt. 9-1 at 19.

The ripeness doctrine subsumes two inquiries: first, "the Article III requirement of standing, which requires a [plaintiff] to allege *inter alia* an injury-in-fact that is 'imminent' or

'certainly impending,'" and, second, "prudential reasons for refusing to exercise jurisdiction." *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012) (first quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427–28 (D.C. Cir. 1996); then quoting *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003)). The second of those inquiries, which is all that is at issue here, is designed to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967). To achieve this goal, courts must evaluate two factors before proceeding: "the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149. Under the fitness prong of this test, courts must consider [1] whether the claim raises a question that "is 'purely legal, [2] whether consideration of the issue would benefit from a more concrete setting, and [3] whether the agency's action is sufficiently final.'" *Atl. States Legal Found. v. EPA*, 325 F.3d 281, 284 (D.C. Cir. 2003) (citation omitted). Under the hardship prong, courts must ask whether the challenged administrative action is likely to have a "direct and immediate effect" on the "primary conduct" of the plaintiff. *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164 (1967) (citation omitted); *see also Nat'l Park Hospitality Ass'n*, 538 U.S. at 810. In the context of APA challenges, however, once it is determined that "an issue is clearly fit for review, there is no need to consider 'the hardship to the parties of withholding court consideration,' because there would be no advantage to be had from delaying review," *Action for Children's Television v. FCC*, 59

F.3d 1249, 1258 (D.C. Cir. 1995) (internal citations omitted); *see also Cohen v. United States*, 650 F.3d 717, 735 (D.C. Cir. 2011).[1]

Turning first to the "fitness" inquiry, the Court concludes that the issues presented by Plaintiffs' policy and practice claims are fit for adjudication. Whether the Offered Wage Rate provision precludes the Secretary from certifying a wage lower than the "prevailing hourly wage," 20 C.F.R. § 655.120(a)—as calculated by the OES—is a "purely legal" question, as is the question whether the Secretary's failure to enforce that requirement constitutes a procedural or substantive violation of the APA, *see Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1282 (D.C. Cir. 2005) ("[C]laims that an agency's action is arbitrary and capricious or contrary to law present purely legal issues." (citation omitted)). The Secretary does not dispute that the questions raised by Plaintiffs' policy and practice claims are purely legal but, instead, argues that consideration of those questions "would benefit from a more concrete setting," *Atl. States Legal Found.*, 325 F.3d at 284 (citation omitted), and that "the agency's action is [not] sufficiently final," *id.*, because "the administrative process is still in flux," Dkt. 9-1 at 20. The Court is unconvinced.

---

[1] Although a plaintiff must allege a "final agency action" to state a claim under the APA, the Court does not address whether Plaintiffs have—or can—satisfy the final agency action requirement because (1) the requirement is non-jurisdictional, *see Trudeau v. FTC*, 456 F.3d 178, 185 (D.C. Cir. 2006), and (2) the Secretary has not moved to dismiss Plaintiffs' complaint on this ground. Moreover, any arguable absence of a final agency action for purposes of Plaintiffs' APA policy and practice challenge does not implicate the "fitness" of Plaintiffs claims for adjudication. As explained above, the "fitness" prong considers whether Plaintiffs' claims are purely legal and sufficiently final to prevent the Court from interfering in an agency proceeding or activity that is inchoate, abstract, or not yet concrete. Here, Plaintiffs allege that the Secretary "regularly grants certifications to employers that do not" pay the prevailing wage, Dkt. 1 at 2 (Compl. ¶ 3), and, indeed, "has granted hundreds of temporary labor certifications where the offered wage rate is lower than the prevailing wage rate," *id*. at 9 (Compl. ¶ 30).

The crux of the Secretary's argument is that he "is currently reconsidering" the H-2A implementing regulations and, thus, there exists "too much speculation regarding whether the [Department's] wage methodology will still affect the Plaintiffs." Dkt. 9-1 at 21; *see also* Dkt. 12 at 12 (noting that the Department "is currently amending the H-2A program regulations and reconsidering the H-2A wage methodology"). But it is the government, and not the Plaintiffs, that asks the Court to speculate. There is no dispute that the existing regulations require that an employer seeking an H-2A certification pay its employees the highest of four wages, including the "prevailing hourly wage." 20 C.F.R. § 655.120(a). Nor does the government offer any basis to question Plaintiffs' allegations that the Secretary "regularly grants certifications to employers" that pay lower than the applicable "prevailing wage," Dkt. 1 at 2 (Compl. ¶ 3), which Plaintiffs argue should be calculated based on the OES, *id.* at 9 (Compl. ¶ 30), and that they are "harmed by" this practice, *id*. at 3 (Compl. ¶ 5).

The government nonetheless posits, based solely on a "joint cabinet statement" and the Department of Labor's Fall 2018 regulatory agenda, that the Secretary "is *considering possible* amendments of different areas of the existing H-2A regulations, including the methodology used to establish the required wage rate for the H-2A program." Dkt. 9-2 at 3–4 (Thompson Decl. ¶ 11) (emphasis added). The mere "consideration" of "possible" amendments that might alter the existing legal landscape, however, hardly renders the existing, binding regulations in "flux." Likewise, a "joint cabinet statement" noting that "the Departments of State, Agriculture, Labor, and Homeland Security are embarking on a process to modernize the H-2A visa program by clarifying and improving the regulations governing the program" promises no relief and sets no timeline. *Id.* at 3 (Thompson Decl. ¶ 6). According to the Secretary's last notification to the Court, the Office of Management and Budget was required to complete its review of the NPRM

by the end of May 2019, Dkt. 20 at 1–2; that date is now past, and the Secretary has not informed the Court that he has—or will imminently—promulgate an NPRM, much less that an ongoing rulemaking is likely to change § 655.120(a) in material respects.

The government's speculation is far from enough to show that the Offered Wage Rate provision is in flux. But even if a rulemaking was in progress, and even if the NPRM proposed to modify § 655.120(a) in material respects, "[t]he fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000); *see also Am. Petroleum Inst.*, 906 F.2d 729, 739–40 (D.C. Cir. 1990) ("If the possibility of unforeseen amendments were sufficient to render an otherwise fit challenge unripe, review could be deferred indefinitely."). The Secretary cites to *Toilet Goods Association*, but that case provides no support for his position. *Toilet Goods Association* dealt with a pre-enforcement challenge, 387 U.S. at 160, while this case challenges an alleged policy and practice that is ongoing. The Supreme Court held that the pre-enforcement challenge in *Toilet Goods Association* was unripe, moreover, because "judicial appraisal . . . [was] likely to stand on a much surer footing in the context of a specific application of [the] regulation" at issue. *Id.* at 164. This case, in contrast, challenges a "generalized policy" that, according to Plaintiffs' claims, has nothing to do with the merits of any individual application for an H-2A certification. *See* Dkt. 9-1 at 21. There is, accordingly, no basis for the Court to conclude that Plaintiffs' policy and practice claims are unfit for review.

Because Plaintiffs' claims are clearly fit for review, the Court need not consider the hardship prong of the ripeness inquiry. *See Atl. States Legal Found.*, 325 F.3d at 284. But even if the Court were to do so, Plaintiffs have offered plausible allegations and uncontested evidence sufficient to show that, absent judicial relief, Plaintiffs risk continued harm in the form of

depressed wages and lost job opportunities.  *Cf. Comite de Apoyo a Los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 184 (3d Cir. 2014) ("*CATA*") ("[T]he possibility . . . [of] some future rulemaking that may or may not lead to a change in the rules does not ameliorate the harm that DOL's current use of those rules is causing plaintiffs now.").  Plaintiffs allege that the Secretary has a continuing policy and practice of disregarding the prevailing wage, at least whenever the relevant SWA fails to specify a prevailing wage rate.  Dkt. 1 at 2, 9 (Compl. ¶¶ 3, 29).  According to Plaintiffs, that was the case in 35 states and territories between 2015 and 2018.  Dkt. 10-2 at 1 (Schell Decl. ¶ 4).  Plaintiffs also offer the declaration of Baldemar Velasquez, the President of FLOC, who attests that "[e]very season, FLOC members work in H-2A jobs where state workforce agencies have not conducted a wage survey" and are thus paid a wage that is lower than the prevailing wage.  Dkt. 10-3 at 2 (Velasquez Decl. ¶¶ 5–6).  Finally, the individual plaintiffs allege that they "regularly travel[] to farms located in other states to obtain well-paid, temporary agricultural employment."  Dkt. 1 at 4 (Compl. ¶ 8).  Accepting the truth of Plaintiffs' allegations, as the Court must do at this stage of the litigation, the Court concludes that the individual plaintiffs will continue to lose higher-wage job opportunities if the Secretary continues his policy and practice of certifying wages lower than the "prevailing wage" calculated by OES.[2]  *Cf. id.* at 10–13 (Compl. ¶¶ 33, 36, 39, 42, 45) (alleging that they would not travel to other areas of the United States for employment for wages that were lower than the prevailing wage calculated by OES).  That is more than sufficient to demonstrate hardship.  The Court will,

---

[2]  To the extent the Secretary maintains that circumstances have changed and that, for example, none of the individual plaintiffs is seeking farm employment in 2019 or 2020, the remedy is not to dismiss the case as unripe, but, rather, to move for summary judgment on grounds of mootness.  *See Taylor v. Resolution Trust Corp.*, 56 F.3d 1497, 1502 (D.C. Cir. 1995) ("A request for injunctive relief remains live only so long as there is some present harm left to enjoin.").  The burden of establishing mootness, however, rests with the defendant.  *Reid*, 920 F.3d at 832.

accordingly, deny Defendants' motion to dismiss with respect to Plaintiffs' policy and practice claims.

## B.     Motion to Transfer

Defendants argue in the alternative that the Court should transfer the case to the United States District Court for the Northern District of Illinois, where "the materials related to the allegedly wrongful certifications are located." Dkt. 9-1 at 22. Pursuant to 28 U.S.C. § 1404(a), the Court may transfer a case to "any other district or division where it might have been brought" for the "convenience of the parties and witnesses, in the interest of justice." The inquiry is two-fold. First, the Court must determine whether the case could have been brought in the transferee district. *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964). Second, the Court must weigh the private and public interests at stake. *Aracely v. Nielsen*, 319 F. Supp. 3d 110, 127 (D.D.C. 2018) (citations omitted). This requires the Court to consider the "preferred forum of the parties," the "location where the claim arose," and other "factors of convenience," as well as "the transferee district's familiarity with the governing law," "the relative congestion of the courts," and the "local interest in deciding local controversies at home." *Id.* at 128–130. As the moving party, the Secretary bears the burden of justifying the proposed transfer. *Id.* at 127 (citations omitted).

### 1.     *Venue Is Not Proper in the Northern District of Illinois*

The Secretary's motion fails at the first step because he has not shown that venue is proper in the Northern District of Illinois. The federal-entity venue provision provides in relevant part:

> A civil action in which a defendant is an officer or employee of the United States or any agency therefor acting in his official capacity . . . or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (A) a defendant in the action resides, (b) a substantial part of the events or omissions giving rise to the claim

occurred . . . or (C) the plaintiff resides if no real property is involved in the
action.

28 U.S.C. § 1391(e)(1).  Although the Department maintains a regional office in Chicago,

neither the Secretary of Labor nor the Department of Labor "resides" in the Northern District of

Illinois; both are, instead, residents of the District of Columbia.  *See Reuben H. Donnelley Corp.*

*v. FTC*, 580 F.2d 264, 267 (7th Cir. 1978) ("There is nothing in [28 U.S.C. § 1391(e)] or its

legislative history which suggests that Congress also sought to allow a federal agency to be sued

Eo nomine wherever it may maintain an office."); *Archuleta v. Sullivan*, 725 F. Supp. 602, 605

(D.D.C. 1989) ("[For] an officer or employee of the United States . . . acting in his official

capacity . . . the place where he resides is not the defendant's personal residence but his official

residence." (citing *Lamont v. Haig*, 590 F.2d 1124 (D.C. Cir. 1978))).  Likewise, none of the

Plaintiffs reside in the Northern District of Illinois: two of the individual plaintiffs reside in

Arizona, Dkt. 1 at 4 (Compl. ¶¶ 10–11); one resides in Texas, *id.* (Compl. ¶ 9); and the fourth

resides in Florida, *id*. at 5 (Compl. ¶ 12); moreover, the FLOC resides in Ohio, *id*. at 1 (Compl.

Caption).

Venue, then, is proper in the Northern District of Illinois only if "a *substantial* part of the

events or omissions giving rise to the claim occurred" there.  28 U.S.C. § 1391(e)(1) (emphasis

added).  The Secretary argues that the events at issue "took place in Chicago" because "Letter[s]

for H2-A Foreign Labor Certifications" are sent from the Department's "Chicago National

Processing Center."  *See* Dkt. 12 at 15 & n.2.  That is not enough.  The core of Plaintiffs'

remaining claims challenges a Department-wide policy and practice.  Based on the allegations of

the complaint and the record as it now stands, the Court cannot conclude that a "substantial part

of" the events at issue occurred in the Northern District of Illinois because: (1) the specific

certifications identified in the complaint were issued to businesses operating in Montana,

Nevada, Nebraska, North Dakota, and South Carolina; (2) there is no reason to believe that the challenged policy and practice will apply to farms located in the Northern District of Illinois with any greater frequency than anywhere else in the United States; (3) the Secretary of Labor, who is ultimately responsible for the policy and practice, resides in the District of Columbia; (4) the Administrator of the Office of Foreign Labor Certification, who is directly responsible for the policy and practice, resides in the District of Columbia, *see* Dkt. 9-2 at 4 (Thompson Decl.) ("Executed . . . Washington, D.C."); *see also* Modernizing Recruitment Requirements for the Temporary Employment of H-2A Foreign Workers in the United States, 83 Fed. Reg. 55985, 55986 (Nov. 9, 2018) (listing Washington, D.C. address for contacting OFLC Administrator); (5) the Offered Wage Rate provision, which forms the core of Plaintiffs' challenge, was promulgated in the District of Columbia, and, if modified, will be modified here as well, *cf. Oceana, Inc. v. Pritzker*, 58 F. Supp. 3d 2, 6 (D.D.C. 2013) (noting that the District has an interest in "federal regulations promulgated in the capital"); and (6) there is no basis in the current record to conclude that the challenged policy and practice was formulated in the Northern District of Illinois. Were this a challenge to the erroneous adjudication of a particular application for a certification by the Department's Chicago National Processing Center, venue might well be proper in the Northern District of Illinois. But that is not what this case is about, and, at least as the record now stands, the Secretary has failed to carry his burden of demonstrating that venue would be proper in the Northern District of Illinois.

2.     *The Public and Private Interest Factors Also Weigh Against Transfer*

In any event, the balance of interests weighs against transferring the case from this Court to the Northern District of Illinois. With respect to the parties' interests, the Court concludes that Plaintiffs' choice of forum outweighs the inconvenience, if any, that the government might suffer

because "materials related to the allegedly wrongful certifications are located at . . . [the Department of Labor's] Chicago National Processing Center." Dkt. 9-1 at 22–23. As explained above, Plaintiffs' claims do not turn on the Chicago National Processing Center's adjudication of any specific application; rather, Plaintiffs are challenging the Secretary's nationwide policy and practice of certifying wages below the prevailing wage for the H-2A visa program. Because the Department is headquartered here, the senior officials responsible for setting national policy are presumably located here, and any documentation relating to national policy is likely located here, the private interest factors weigh against transfer.

Consideration of the public interest factors supports the same result. The Secretary does not contend that the Northern District of Illinois has any unique expertise in adjudicating APA challenges of this type nor does he allege that the courts there are less congested than those here. Instead, his argument rests on the bare assertion that the present controversy is "local" to Illinois. Dkt. 9-1 at 24. That is not right. The policy and practice, if there is one, applies nationwide. *See Otay Mesa Prop. L.P. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 122, 126 (D.D.C. 2008) (setting forth test for determining whether a controversy is "local" in nature). Where, as here, a controversy "stems from the formulation of national policy on an issue of national significance," the public interest typically does not favor transferring the case to a different venue. *Oceana, Inc.*, 58 F. Supp. 3d at 6; *see also Ctr. for Biological Diversity v. Ross*, 310 F. Supp. 3d 119, 127–28 (D.D.C. 2018); *Stewart v. Azar*, 308 F. Supp. 3d 239, 247 (D.D.C. 2018).

The Court will, accordingly, deny Defendants' request to transfer the case to the District Court for the Northern District of Illinois.

## C. Motion to Stay

Finally, the Secretary moves to "stay all proceedings in this case until April 26, 2019," Dkt. 9-1 at 27, the date by which the Secretary initially anticipated "that its plan for additional rulemaking concerning the challenged wage-rate issued in this case [would have been] better known," *id.* at 9. That date has now passed, and the Secretary has failed to inform the Court that he has—or will imminently—issue a NPRM proposing to amend § 655.120(a) in relevant respects. It, accordingly, appears that the Secretary's request for a stay is moot.

Even assuming that the Secretary's request for a stay is still operative, however, the Court is unpersuaded. The Court, to be sure, has broad discretion to stay a case pending the outcome of proceedings in another forum. *See Hisler v. Gallaudet Univ.*, 344 F. Supp. 2d 29, 35 (D.D.C. 2004) ("[A] trial court may, with propriety, find it is efficient for its own docket and the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case." (citation omitted)). But the Supreme Court has cautioned that, "if there is even a fair possibility that the stay . . . will work damage to someone else," the movant must "must make out a clear case of hardship or inequity in being required to go forward." *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936). The Secretary contends that a stay is warranted here because the Department "is currently engaged in rulemaking on the H-2A program, the results of which could substantially affect the entire nature of the case." Dkt. 9-1 at 25. For the same reasons that the Secretary's inchoate plan to issue an NPRM does not undercut the fitness of Plaintiffs' claims for adjudication, the Court concludes that a stay is unwarranted.

In light of the uncertainties regarding the contemplated NPRM discussed above, and the risk that the existing policy and practice of certifying wages lower than the prevailing wage defined by the OES, Dkt. 10 at 29–30, will cause Plaintiffs concrete harm in the near future, the

balance of equities tips decidedly against staying the litigation.  *See Landis*, 299 U.S. at 255.

Ultimately, the Secretary's only argument in favor of a stay invokes the interests of judicial

economy.  Dkt. 12 at 18.  That is not enough, especially where it is not "certain" that the

"proposed rulemaking . . . will moot the case."  *Am. Hosp. Ass'n v. Dep't of Health and Human

Servs.*, 2018 WL 5777397, at *2 (D.D.C. Nov. 2, 2018); *see also Alternatives Res. & Dev.

Found. v. Glickman*, 101 F. Supp. 2d 7, 9, 15–16 (D.D.C. 2000) ("[T]here is no basis to stay [a]

lawsuit as being premature" when "it is purely speculative at this time whether any future agency

action will change the status quo.").

    The Court will, accordingly, deny the Secretary's request to stay the litigation.

## CONCLUSION

    For the foregoing reasons, it is hereby **ORDERED** that Defendants' motion to dismiss,

Dkt. 9, is **GRANTED** in part and **DENIED** in part.  Plaintiffs' challenges to the five identified

certifications are hereby dismissed as moot.

    It is further **ORDERED** that Defendants' motion to transfer or stay the case, Dkt. 9, is

**DENIED**.

    It is further **ORDERED** that the parties shall appear for a status conference on July 9,

2019, at 11:00 a.m. in Courtroom 21 to discuss further proceedings in this case.

    **SO ORDERED.**


                     /s/ Randolph D. Moss
                     RANDOLPH D. MOSS
                     United States District Judge


Date:  June 24, 2019