**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MIGUEL GARCIA, *et al.*,

      *Plaintiffs*,

   v.

AL STEWART, in his official capacity as
Acting Secretary of Labor,[1] *et al.*,

      *Defendants*.

Civil Action No. 18-1968 (RDM)

**MEMORANDUM OPINION**

The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, permits foreign

workers temporary admission into the United States to perform agricultural services that

domestic workers are unavailable or unwilling to provide themselves.  By regulation, any hourly

wage that foreign workers receive must be no less than the highest of four enumerated wage

rates.  20 C.F.R. § 655.120(a); *see also id.* § 655.122(l).  In many cases, however, not all four

rates are available.  At issue here is what happens next: may foreign workers receive the highest

of the remaining three rates, as Defendants believe, or must the government calculate the missing

rate, as Plaintiffs contend?

The dispute is before the Court on the parties' cross motions for summary judgment.

Dkt. 31; Dkt. 34.  For the reasons that follow, the Court will **GRANT** Defendants' motion, Dkt.

34, and will **DENY** Plaintiffs' motion, Dkt. 31.

---

[1]  Al Stewart, the current Acting Secretary of Labor, is substituted for Eugene Scalia pursuant to
Federal Rule of Civil Procedure 25(d).

1

## I. BACKGROUND

**A.     Statutory and Regulatory Background**

Congress created the H-2A visa program to address temporary shortages of agricultural labor in the United States.  *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(a).  The program, named after the INA provision authorizing its existence, is jointly administered by the Department of Labor ("DOL") and the United States Citizenship and Immigration Services ("USCIS"), a component of the Department of Homeland Security.  *See Mendoza v. Perez*, 754 F.3d 1002, 1007 (D.C. Cir. 2014).  Before hiring H-2A workers, an employer must obtain a certification from the Secretary of Labor establishing that (1) there is a shortage of U.S. workers who are "able, willing, and qualified" to "perform the labor or services" at issue and (2) "the employment of [foreign workers] in such labor or services will not adversely affect the wages and working conditions" of similarly situated U.S. workers.  8 U.S.C. § 1188(a)(1); *see also* 20 C.F.R. § 655.103(a).  "Only after obtaining [the Secretary's] certification may the employer petition the United States Citizenship and Immigration Services to classify a specific foreign worker as an H-2A temporary worker."  *Mendoza*, 754 F.3d at 1007.

The Secretary has promulgated regulations governing the H-2A visa certification process. *Id.* at 1008 (citing 20 C.F.R. pt. 655, subpart B).  Those regulations assign the authority to issue temporary foreign labor certifications to the Department of Labor's Office of Foreign Labor Certification ("OFLC").  *See* 20 C.F.R. § 655.101 ("The determinations [shall be] made by the OFLC Administrator who, in turn, may delegate this responsibility to designated staff members; e.g., a Certifying Officer (CO).").  To "ensure that the employment of H-2A workers does not 'adversely affect the wages and working conditions' of domestic workers," the regulations specify "minimum wages and working conditions" for jobs under the H-2A visa program.

*Hispanic Affs. Project v. Perez*, 141 F. Supp. 3d 60, 64 (D.D.C. 2015) (quoting 8 U.S.C.

§ 1188(a)(1) (citing *Mendoza*, 754 F.3d at 1008)); *see also* 20 C.F.R. § 655.122.

At issue in this case is the "Offered Wage Rate" provision of the regulations, which states

that employers participating in the H-2A visa program "must offer, advertise in [their]

recruitment, and pay" workers the highest of four wages:

> [1] the [Adverse Effect Wage Rate] ("AEWR")], [2] the prevailing hourly wage
> or piece rate, [3] the agreed-upon collective bargaining wage, or [4] the [f]ederal
> or [s]tate minimum wage, except where a special procedure is approved for an
> occupation or specific class of agricultural employment.

20 C.F.R. § 655.120(a);[2] *see also id.* § 655.122(l) ("If the worker is paid by the hour, the

employer must pay the worker at least the AEWR, the prevailing hourly wage rate, the prevailing

piece rate, the agreed-upon collective bargaining rate, or the Federal or State minimum wage

rate, in effect at the time work is performed, whichever is highest, for every hour or portion

thereof worked during a pay period.").  The regulations further provide that the "criteria for

[OFLC's] certification" of an employer "include whether the employer has . . . complied with the

offered wage rate criteria in § 655.120."  *Id.* § 655.161(a).

Three of the wage measures listed in the Offered Wage Rate provision are not at issue in

this case: the "AEWR," which is defined as the "annual weighted average hourly wage for field

and livestock workers (combined) for the state or region" for which it is calculated (as reported

by the U.S. Department of Agriculture), Dkt. 34-1 at 13 (citing 20 C.F.R. § 655.103(b)); "the

agreed-upon collective bargaining wage;" and "[f]ederal or [s]tate minimum wage," 20 C.F.R.

§ 655.120(a).

---

[2]  The Offered Wage Rate provision has not been modified since 2010.  *See* Temporary
Agricultural Employment of H-2A Aliens in the United States, 75 Fed. Reg. 6884 (final rule Feb.
12, 2010) (to be codified at 20 C.F.R. pt. 655) (hereinafter "2010 Rule").

3

This case focuses on the remaining wage measure: "the prevailing hourly wage." *Id.*
The regulations define "prevailing wage" to mean the "[w]age established pursuant to 20 C.F.R.
[§] 653.501(d)(4)." *Id.* § 655.103(b).  Prior to 2016, § 653.501(d)(4) provided that "[n]o local
office shall place a job order seeking workers to perform agricultural . . . work into intrastate
clearance unless . . . [t]he wages and working conditions offered are not less than the prevailing
wages and working conditions among similarly employed agricultural workers in the area of
intended employment or the applicable [f]ederal or [s]tate minimum wage, whichever is higher."
20 C.F.R. § 653.501(d)(4) (2016).  What was once § 653.501(d)(4), however, has now been
relocated to § 653.501(c)(2)(i).  That provision provides, in relevant part, that state workforce
agencies ("SWAs") "must ensure" that "[t]he wages and working conditions offered are not less
than the prevailing wages and working conditions among similarly employed farmworkers in the
area of intended employment or the applicable [f]ederal or [s]tate minimum wage, whichever is
higher."  20 C.F.R. § 653.501(c)(2)(i).

To satisfy this obligation, SWAs calculate the prevailing wage based on surveys
conducted "in accordance with Handbook 385's wage-finding process."  Dkt. 34-1 at 14 n.2; *see
also* Dkt. 30-1 at 2–26 (copy of Handbook).  Although the Handbook was "last updated in
August 1981 [and] predates the creation of the H-2A program," "the H-2A program has relied on
the [Handbook] to help establish prevailing wage rates" "since its inception."  Dkt. 31-2 at 2
(Pasternak Decl. ¶¶ 6–7).  The Handbook "supplies guidelines for the SWAs to follow in
carrying out their surveys"—for instance, "factors for determining which crops or agricultural
activities should be surveyed" and "recommended sources and methods of collecting wage
data"—but otherwise leaves SWAs with considerable discretion "to decide if, how, and when to
conduct prevailing wage surveys."  *Id.* at 3 (Pasternak Decl. ¶¶ 8, 11).  Many SWAs exercise that

discretion by declining to conduct prevailing wage surveys at all.  *See* Dkt. 31 at 10 ("[F]or forty

of fifty-three states and territories, no such survey finding has been reported for 2019.").

## B.    Factual Background

Plaintiffs are four U.S. agricultural workers and an agricultural labor organization.  Dkt. 1

at 3 (Compl. ¶ 5).  The individual plaintiffs—Miguel Garcia, Alberto Olvera Gomez, Jose

Botella Avila, and Gerard Princilus—are lawful permanent residents of Texas, Arizona, and

Florida, who travel to "agricultural businesses across the country" to obtain "temporary

agricultural employment."  *Id.* at 4–5 (Compl. ¶¶ 8–12).  Each has significant experience in

agricultural labor (on the order of decades), avers a desire to continue working in agriculture for

the foreseeable future, and is willing to travel virtually anywhere in the United States to do so,

assuming that the wages are suitable.  *See* Dkt. 37-7 at 1–2 (Gomez Decl. ¶¶ 3–7); Dkt. 37-8 at

1–2 (Princilus Decl. ¶¶ 3–8); Dkt. 37-9 at 1–2 (Avila Decl. ¶¶ 3–9); Dkt. 37-10 at 1–2 (Garcia

Decl. ¶¶ 3–8).

The fifth Plaintiff is the Farm Labor Organizing Committee ("FLOC"), "a farmworker

labor union, with nearly 8,000 members throughout the eastern half of the United States,"

"[m]any" of whom are "Mexican nationals participating in the H-2A guestworker program."

Dkt. 1 at 3, 5 (Compl. ¶¶ 5, 13).  "FLOC also has members who are U.S.-based workers who

perform migrant and seasonal agricultural work."  Dkt. 46-2 at 1 (Velasquez 2d Decl. ¶ 3).  "The

majority of FLOC members work in Ohio, North Carolina, and South Carolina," and "[e]very

season, FLOC members work in H-2A jobs where state workforce agencies have not conducted a

wage survey producing a wage rate finding."  Dkt. 10-3 at 2 (Velasquez Decl. ¶ 5).

## C.    Procedural Background

Plaintiffs filed suit in August 2018, raising five claims under the Administrative

Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*  Dkt. 1 (Compl.).  In Counts I and II, Plaintiffs alleged that DOL had unlawfully granted "five specific certifications . . . where the employer was offering a wage rate lower than the prevailing wage identified by DOL itself."  *Id.* at 3 (Compl. ¶ 4); *see also id.* at 14–15 (Compl. ¶¶ 51–56).  In the remaining Counts, Plaintiffs alleged that "DOL's policy and practice of granting temporary employment certifications without regard to the prevailing wage when state workforce agencies have not conducted wage surveys to ascertain the prevailing wage or have issued 'no finding' as to the prevailing wage rate" is contrary to law (Count III), arbitrary and capricious (Count IV), and constitutes agency action taken without observance of required procedure (Count V).  *Id.* at 15–17 (Compl. ¶¶ 57–65).

In October 2018, Defendants moved to dismiss for want of subject-matter jurisdiction, Dkt. 9-1 at 17–22, and moved, in the alternative, to transfer the case to the U.S. District Court for the Northern District of Illinois, *id.* at 22–24, or to stay the case pending issuance of a proposed rule, *id.* at 24–26.  In June 2019, the Court issued a memorandum opinion and order granting in part and denying in part the motion to dismiss and denying the motion to transfer or stay the case.  *Garcia v. Acosta*, 393 F. Supp. 3d 93, 111 (D.D.C. 2019).  The Court concluded that Plaintiffs' challenges to the five identified certifications were moot (Counts I–II), but that Plaintiffs' policy-and-practice claims (Counts III–V) remained justiciable.  *Id.*

Plaintiffs now move for summary judgment under Federal Rule of Civil Procedure 56, Dkt. 31, and Defendants oppose that motion, Dkt. 33, and cross-move for summary judgment under Rule 56 and for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), Dkt. 34.  In November 2020, "the parties alerted the Court to a final rule from DOL, promulgated November 5, 2020," under which DOL would "utilize the [Bureau of Labor

Statistics Occupational Employment Statistics] survey [("OES")] in calculating the AEWR." Dkt. 45 at 2.  The Court observed that one theory of Plaintiffs' "harm is that they are missing out on potentially higher wages in states where the prevailing wage would exceed the AEWR if DOL were to itself calculate and consider the prevailing wage in those areas" using OES.  *Id.* at 1.  Accordingly, the Court indicated that "it [wa]s unclear how Plaintiffs could be harmed by DOL not using the OES also to set the prevailing wage, since doing so might set both the AEWR and the prevailing wage at the same rate, producing the same approved wage in either case."  *Id.* at 2.  The Court therefore ordered the parties to address "the impact of the new rule on Plaintiffs' standing."  *Id.*

The parties did so.  Dkt. 46; Dkt. 47.  Plaintiffs contended that DOL's rule had "*no impact* on Plaintiffs' standing."  Dkt. 46 at 1.  In support of that proposition, they submitted two additional declarations—the first by Gregory Schell, demonstrating that OES wages were still higher than comparable AEWR wages in at least thirteen counties across the country, *see* Dkt. 46-1 (Schell Decl.), and the second by Baldemar Velasquez, FLOC's president, further addressing FLOC's membership, *see* Dkt. 46-2 (Velasquez Decl.).  Defendants replied that "serious questions remain[ed] as to whether the Plaintiffs have standing" because the rule was, "by some measures, providing [Plaintiffs] the relief they sought."  Dkt. 47 at 6.  Defendants also argued that the Schell and Velasquez declarations did nothing to remedy Plaintiffs' Article III shortcomings.  *Id.* at 9–10.

The following week, on November 30, 2020, Defendants filed a notice of administrative action indicating that DOL had submitted a "final rule regarding the H-2A nonimmigrant visa program . . . to the Office of Information and Regulatory Affairs ('OIRA')" for clearance.  Dkt. 48 at 1.  The Court thereafter issued a Minute Order requiring the parties "to file a joint status

report on or before December 4, 2020, indicating whether the Court should still decide the

pending motions, given the possibility that they may soon be mooted by this further regulatory

action, or whether it would be appropriate to stay the case until after the final rule is published."

Minute Order (Dec. 4, 2020).  "The parties disagree[d] as to how the Court should proceed in

light of Defendants' . . . submission of [the draft final rule to] . . . OIRA."  Dkt. 49 at 1.

Plaintiffs wanted the pending motions resolved, *id.*; Defendants maintained that "the Court's

resources would be best conserved by staying the litigation until after the impending final rule

has gone into effect," *id.* at 3.  On January 21, 2021, however, Plaintiffs informed the Court that

DOL had withdrawn the draft rule.  Dkt. 50 at 1.  DOL explained that, "[w]ith the recent change

in presidential administrations," it "withdrew the forthcoming rule . . . for the purpose of

reviewing issues of law, fact, and policy raised by the rule."  Dkt. 51 at 1.

    At this point, the parties' motions are fully briefed and there is no impending regulatory

action that might counsel against resolving them.  The Court will, accordingly, do so.

## II.  LEGAL STANDARD

### A.  Rule 12(c)

"When evaluating a motion for judgment on the pleadings under Federal Rule of Civil

Procedure 12(c), courts employ the same standard that governs a Rule 12(b)(6) motion to

dismiss."  *McNamara v. Picken*, 866 F. Supp. 2d 10, 14 (D.D.C. 2012).  "To survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell

Atl. Corp. v. Twombl*y, 550 U.S. 544, 570 (2007)).  The facts alleged need not be "detailed," but

they must "allow[ ] the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged;" it is not enough to simply demonstrate the "sheer possibility that a

defendant has acted unlawfully." *Id.* (quotation marks and citation omitted).  Accordingly, "[a] pleading that offers [only] 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).  The Court assumes the truth of the complaint's factual allegations, "even if doubtful in fact, and [draws] all reasonable inferences in favor of the plaintiff." *Townsend v. United States*, 236 F. Supp. 3d 280, 296 (D.D.C. 2017) (citing *Twombly*, 550 U.S. at 555; *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016)).  The Court does not, however, assume the truth of legal conclusions asserted within the complaint, *Iqbal*, 556 U.S. at 678, nor need it "accept inferences drawn by [a] plaintiff[ ] if such inferences are unsupported by facts set out in the complaint," *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  "When evaluating a motion for judgment on the pleadings, the [C]ourt may rely on the pleadings, the exhibits to the pleadings, and any judicially noticeable facts to assess whether the movant has met its burden." *Kambala v. Checchi & Co. Consulting, Inc.*, 280 F. Supp. 3d 131, 137 (D.D.C. 2017).

**B.    Rule 56**

"In a case involving review of a final agency action under the [APA,] . . . summary judgment . . . serves as a 'mechanism for deciding, as a matter of law, whether the agency action is . . . consistent with the APA standard of review.'" *Fisher v. Pension Benefit Guar. Corp.*, 468 F. Supp. 3d 7, 18 (D.D.C. 2020) (quoting *Cayuga Nation v. Bernhardt*, 374 F. Supp. 3d 1, 9 (D.D.C. 2019)).  As relevant here, that standard requires the Court to determine whether the Secretary's purported policy and practice of ignoring the prevailing wage rate absent data from SWAs was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C), or "without observance of procedure required by law," *id.* § 706(2)(D).

## III.  ANALYSIS

**A.      Standing**

The threshold issue in this case is whether Plaintiffs have standing to bring suit.  They

claim they do for two reasons.  First, Plaintiffs argue that "FLOC has standing to sue based on

the ongoing harms to its members."  Dkt. 37 at 15.  And second, they assert that the four named

Plaintiffs each have standing in their own right because they "suffer harm in the form of

depressed wages and lost job opportunities in states where the prevailing wage exceeds the

AEWR."  Dkt. 46 at 2; *see also* Dkt. 37 at 17–21.  For the reasons that follow, the Court

concludes that the individual Plaintiffs have standing to pursue this action.

1.  *Legal Standard*

Article III of the Constitution limits "[t]he judicial [p]ower of the United States" to

"Cases" and "Controversies."  U.S. Const. art. III.  "To state a case or controversy under Article

III, a plaintiff must establish standing."  *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125,

133 (2011).  And "[t]he 'irreducible constitutional minimum of standing,'" in turn, "'contains

three elements': '(1) injury-in-fact, (2) causation, and (3) redressability.'"  *Am. Freedom Law

Ctr. v. Obama*, 821 F.3d 44, 48 (D.C. Cir. 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S.

555, 560 (1992)).  Under the first element, injury-in-fact, a plaintiff's complained-of injury must

be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."

*Lujan*, 504 U.S. at 560 (quotation marks and citations omitted).  Under the second element,

causation, the injury must be "fairly traceable to the challenged action of the defendant, and not

the result of the independent action of some third party."  *Id.* at 560–61 (quotation marks,

citation, and alterations omitted).  And finally, under the third element, redressability, it must be

10

"likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" of the court. *Id.* at 561 (quotation marks and citation omitted).

Where a plaintiff "has been accorded a procedural right to protect his concrete interests," the Supreme Court has explained that the right can be "assert[ed] . . . without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7. This does not "eliminate any of the irreducible elements of standing," to be sure; "[i]t does, however, relax the immediacy and redressability requirements." *California v. Trump*, No. 19-cv-960, 2020 WL 1643858, at *6 (D.D.C. Apr. 2, 2020) (quotation marks, brackets, and citations omitted). This means that a litigant "vested with a procedural right . . . has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). This rule applies equally to an organizational plaintiff like FLOC, which may assert standing on its "own behal[f] ('organizational standing') or on behalf of [its] members ('associational standing')." *Env't Integrity Project v. McCarthy*, 139 F. Supp. 3d 25, 36 (D.D.C. 2015); *see also O.A. v. Trump*, 404 F. Supp. 3d 109, 142 (D.D.C. 2019).

A plaintiff always "bears the burden of demonstrating its standing at every stage of the litigation," *California*, 2020 WL 1643858, at *4, and must do so "with the manner and degree of evidence required at the successive stages of the litigation," *Lujan*, 504 U.S. at 561. At the summary judgment stage, therefore, a plaintiff must adduce "specific facts" "set forth by affidavit or other evidence" to establish his standing, *Lujan*, 504 U.S. at 561 (quotation marks omitted), such "that there exists no genuine issue of material fact as to justiciability," *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999). Moreover, because "standing is not dispensed in gross," *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017)

(quotation marks and citation omitted), a plaintiff must "demonstrate standing for each claim he seeks to press" against each defendant, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006), and "for each form of relief sought," *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).  When multiple plaintiffs pursue the same claim, as long as one plaintiff has standing, the Court "'need not consider the standing of the other plaintiffs to raise that claim.'"  *Bauer v. DeVos*, 325 F. Supp. 3d 74, 88 (D.D.C. 2018) (quoting *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996)).

2.  *Application*

The Court first considers whether the individual Plaintiffs have suffered a cognizable injury in fact.  On that score, the individual Plaintiffs rely on the "'increased competition [and] lost opportunity'" they face in their job markets as a result of DOL's allegedly unlawful issuance of foreign labor certifications to satisfy Article III's injury-in-fact requirement.  Dkt. 37 at 17 (quoting *Mendoza*, 754 F.3d at 1010).  The logic of this theory of injury is straightforward:  DOL cannot lawfully grant foreign labor certifications if SWAs fail to conduct adequate prevailing wage surveys; few, if any, SWAs conduct adequate prevailing wage surveys; and consequently, few, if any, foreign labor certifications should be granted.  By ignoring the prevailing wage requirement, then, DOL unlawfully licenses the admission of a significant number of H-2A workers who compete against U.S. workers for seasonal agricultural employment.[3]  That

---

[3]  In 2020 alone, the United States admitted over 200,000 H-2A workers.  Bureau of Consular Affairs, *Nonimmigrant Visas Issued by Classification (Including Border Crossing Cards) Fiscal Years 2016–2020*, https://travel.state.gov/content/dam/visas/Statistics/AnnualReports/ FY2020AnnualReport/FY20AnnualReport-TableXVB.pdf (last visited February 5, 2021).

increased competition harms Plaintiffs, in turn, by artificially depressing their wages and limiting the job opportunities available to them.

The Court agrees that the individual Plaintiffs have suffered and will likely continue to suffer a cognizable, competitive injury. "The D.C. Circuit has long recognized—and recently reaffirmed—the doctrine of competitor standing, whereby a party suffers a cognizable injury under Article III when an agency lift[s] regulatory restrictions on their competitors or otherwise allow[s] increased competition against them." *Permapost Prods., Inc. v. McHugh*, 55 F. Supp. 3d 14, 21 (D.D.C. 2014) (quotation marks omitted); *see also Save Jobs USA v. Dep't of Homeland Sec.*, 942 F.3d 504, 510 (D.C. Cir. 2019); *Mendoza*, 754 F.3d at 1011; *Int'l Brotherhood of Teamsters v. U.S. Dep't of Transp.*, 724 F.3d 206, 211–12 (D.C. Cir. 2013); *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010). The requirements for establishing competitor standing are twofold: first, "a party in a particular market must show an actual or imminent increase in competition in the relevant market," and, second, the plaintiff must "demonstrate that it is a direct and current competitor whose bottom line may be adversely affected by the challenged government action." *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, No. 16-cv-1170, 2021 WL 329847, at *6 (D.D.C. Jan. 28, 2021) (quotation marks, citations, brackets, and emphasis omitted); *see also KERM, Inc. v. Fed. Commc'ns Comm'n*, 353 F.3d 57, 60–61 (D.C. Cir. 2004); *Arpaio v. Obama*, 797 F.3d 11, 23 (D.C. Cir. 2015).

Both requirements are satisfied here. First, DOL's allegedly unlawful certifications produce an "actual . . . increase in competition in the relevant market." *Wash. All. of Tech. Workers*, 2021 WL 329847, at *6. As Plaintiffs note, "findings of a prevailing wage are rare," and DOL's certifications for "the overwhelming majority of H-2A jobs" occur without prevailing

wage data.  Dkt. 31 at 19–20.  And if *none* of those certifications should have (or should be) issued, *see* Dkt. 1 at 17 (Compl. Prayer for Relief), then the number of H-2A laborers would plummet.  The D.C. Circuit "has repeatedly held that an individual who competes in a labor market has standing to challenge allegedly unlawful government action that is likely to lead to an increased supply of labor—and thus competition—in that market."  *Save Jobs USA*, 942 F.3d at 509.  And here, that is precisely what the individual Plaintiffs claim is happening:  DOL unlawfully certifies the admission of many foreign H-2A workers, but for whose presence, the labor supply for seasonal agricultural work would be lower.  That is a cognizable harm.  *See id.* at 510 (finding competitive injury where challenged rule "cause[d] more H-1B visa holders [(against whom plaintiffs competed for jobs)] to remain in the United States than otherwise would"); *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 802 (D.C. Cir. 1985) (union challenging procedural validity of immigration rules that "allow[ed] aliens into the country to perform work which would otherwise likely go to [plaintiff's] members" suffered injury in fact because "those alien workers represent competition which [plaintiff's members] would not face if the Government followed the procedures required by law").

Second, the individual Plaintiffs have established that they are "direct and current competitor[s] whose bottom line may be adversely affected by the challenged government action."  *Wash. All. of Tech. Workers*, 2021 WL 329847, at *6.  The individual Plaintiffs compete in the same market for the same jobs as H-2A workers, *see, e.g.*, Dkt. 37-9 at 2 (Avila Decl. ¶ 11); Dkt. 37-10 at 2 (Garcia Decl. ¶ 10); Dkt. 37 at 13, 17, and their bottom line may be adversely affected because "'[b]asic economic logic'" holds that, *ceteris paribus*, an increase in labor supply drives labor prices (*i.e.,* wages) down, *Am. Inst. of Certified Pub. Accts. v. IRS*, 804 F.3d 1193, 1198 (D.C. Cir. 2015) (quoting *United Transp. Union v. ICC*, 891 F.2d 908, 912 n.7

(D.C. Cir. 1989); *see also id.* ("[I]ncreased competition almost surely injures a seller in one form or another[.]"); *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 892 F.3d 332, 339 (D.C. Cir. 2018) ("'[A]n actual or imminent increase in competition . . . will almost certainly cause an injury in fact.'" (quoting *Sherley*, 610 F.3d at 73)).

To be sure, DOL may grant foreign labor certifications only *after* determining that there is a shortage of U.S. workers who are "able, willing, and qualified" to "perform the labor or services" at issue.  8 U.S.C. § 1188(a)(1)(A); *see also* 20 C.F.R. § 655.103(a) ("In order to bring nonimmigrant workers to the U.S. to perform agricultural work, an employer must first demonstrate to the Secretary that there are not sufficient U.S. workers able, willing, and qualified to perform the work in the area of intended employment at the time needed[.]").  It might be argued, therefore, that the individual Plaintiffs do *not* compete against H-2A workers because those workers enter the labor supply only once U.S. workers have left it.  But even though this is a substantial argument (albeit raised by neither party), the Court concludes that it does not undermine the individual Plaintiffs' standing.  First, the INA itself recognizes that "the employment of [an H-2A worker] in [agricultural] labor or services" may "adversely affect the wages and working conditions of workers in the United States similarly employed" even where "there are not sufficient [U.S.] workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition." 8 U.S.C. § 1188(a)(1).  Were it otherwise, the INA would have no need to require that both conditions—domestic labor shortage and wage adequacy—be present prior to the granting of a foreign labor certification.

In addition, the D.C. Circuit has explained that the "direct and current competitor" requirement should not be "overread[]," as it "simply distinguishes an existing market participant

from a potential—and unduly speculative—participant." *Save Jobs USA*, 942 F.3d at 510

(quotation marks omitted).  Here, the individual Plaintiffs are participants in the market for

seasonal, agricultural labor.  Dkt. 37-7 at 1–2 (Gomez Decl. ¶¶ 3–7); Dkt. 37-8 at 1–2 (Princilus

Decl. ¶¶ 3–8); Dkt. 37-9 at 1–2 (Avila Decl. ¶¶ 3–9); Dkt. 37-10 at 1–2 (Garcia Decl. ¶¶ 3–8).

Requiring that they first "accept substandard wages and working conditions" before deeming

them direct competitors is "precisely the situation the INA seeks to prevent," and "cannot be the

result [that] Congress intended."  *Mendoza*, 754 F.3d at 1017 (citing 20 C.F.R. § 655.0(a)(2)

("U.S. workers cannot be expected to accept employment under conditions below the established

minimum levels.").  Indeed, the very reason the individual Plaintiffs cannot perform the labor at

issue is, they explain, *because* DOL permits the hiring of H-2A workers at allegedly artificially

low wage rates.  Dkt. 37-7 at 2 (Gomez Decl. ¶ 8); Dkt. 37-8 at 2 (Princilus Decl. ¶ 9); Dkt. 37-9

at 2 (Avila Decl. ¶ 11); Dkt. 37-10 at 2 (Garcia Decl. ¶ 10).  That does not render U.S. workers

non-competitors; just non-competitive.

        In response to the foregoing, Defendants argue that the individual Plaintiffs' competitive

injuries are speculative because they have not identified "whether," "where," or in "what line of

work" they will participate in the future.  Dkt. 34-1 at 26.  But they have.  As to "whether"—the

individual Plaintiffs have been working as agricultural laborers for decades, and they have no

intention of stopping any time soon.  Dkt. 37-7 at 1 (Gomez Decl. ¶ 3) ("For decades, I have

worked harvesting crops in Arizona and elsewhere. . . .  My intention is to continue working as a

farm laborer as long as I am able to do so."); Dkt. 37-8 at 1 (Princilus Decl. ¶ 3) ("For over two

decades, I have earned my living performing farm labor jobs.  I expect to continue working in

farm labor jobs as long as I am able to do so[.]"); Dkt. 37-9 at 1 (Avila Decl. ¶ 3) ("Since 1986, I

have earned my living as an agricultural working, harvesting fruits and vegetables in the United

States. . . .  I plan to continue working in farm labor as long as I am able to do so."); Dkt. 37-10 at 1 (Garcia Decl. ¶¶ 3, 7) ("Since 1990, I have been a farmworker in the United States. . . .  I want to continue working as a farmworker for as long as I am able.").  As for "where"—nearly anywhere.  Dkt. 37-7 at 2 (Gomez Decl. ¶ 8) ("I am willing to travel anywhere in the western United States for a good-paying farm labor job."); Dkt. 37-8 at 2 (Princilus Decl. ¶ 9) ("I am willing to travel anywhere in the eastern United States for a good-paying agricultural job."); Dkt. 37-9 at 2 (Avila Decl. ¶ 11) ("I am willing to travel anywhere in the western United States for a good-paying agricultural job."); Dkt. 37-10 at 2 (Garcia Decl. ¶ 10) ("I am willing to travel anywhere in the United States for well-paying jobs.").  And finally, as for "what line of work"— the individual Plaintiffs explain in detail their respective agricultural competencies.  Dkt. 37-7 at 2–3 (Gomez Decl. ¶¶ 4–6); Dkt. 37-8 at 1–2 (Princilus Decl. ¶¶ 4–7); Dkt. 37-9 at 1–2 (Avila Decl. ¶¶ 4–8); Dkt. 37-10 at 1 (Garcia Decl. ¶¶ 3–6).

The Court therefore concludes that the individual Plaintiffs have sufficiently demonstrated a cognizable injury under Article III.  *Cf. Mendoza*, 754 F.3d at 1013 (plaintiffs suffered cognizable injury by "affirm[ing] their desire to work as herders and stat[ing] their intention to do so if wages and working conditions improve[d]," despite several plaintiffs not having worked or applied for "specific herder jobs" in years); *Save Jobs USA*, 942 F.3d at 511 (plaintiffs suffered cognizable injury where they competed against H–1B visa holders "in the past, and [where] . . . nothing prevent[ed]" future competition); *Wash. All. of Tech. Workers*, 892 F.3d at 340 (plaintiffs who "affirmed their desire to work" suffered competitive injury even where they had "not filled out formal job applications since the [challenged] [r]ule took effect").

The remaining questions, then, are whether that injury is (1) fairly traceable to Defendants' conduct, and (2) redressable by a favorable court decision.  *See Lujan*, 504 U.S. at

17

560–61.  The answers are clear: yes, and yes.  It is Defendants' alleged failure to adhere to the governing regulations in granting foreign labor certifications without considering the prevailing wage that leads to the increased competition that the individual Plaintiffs will face.  *See Wash. All. of Tech. Workers*, 892 F.3d at 341 (finding "increase in competition [was] directly traceable to" agency rule where that rule "authorize[d] work for [those] . . . with whom [plaintiff's] members compete for jobs").  And the Court may, as Plaintiffs request, "[e]njoin defendants from granting a temporary foreign labor certification absent a determination that it complies with the wage requirements of the INA and its implementing regulations."  Dkt. 1 at 17 (Compl. Prayer for Relief); *cf. Wash. All. of Tech. Workers*, 892 F.3d at 341 ("A court order invalidating the [challenged] Rule would eliminate workers from the [relevant] job market and therefore decrease competition for the . . . jobs pursued by [plaintiff's] members.  The specific injury suffered, then, would be remedied by a favorable court order.").

The individual Plaintiffs consequently have standing to bring this action.  Because they do, the Court need not consider FLOC's standing to sue.  *See Glickman*, 92 F.3d at 1232.[4]

---

[4] In their reply brief, Defendants argue that FLOC falls outside the INA's zone of interests and should thus be dismissed as a Plaintiff in this action.  Dkt. 41 at 9–10.  Whether FLOC is within the INA's zone of interests is a merits inquiry, *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014), and, as such, may usually be addressed only after confirming the relevant party's standing, *see generally Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998).  Here, however, Defendants have forfeited their zone-of-interests argument by not raising it in their opening brief, and thus, the Court need not consider it.  *See Am. Wildlands v. Kempthorne,* 530 F.3d 991, 1001 (D.C. Cir. 2008) ("Issues may not be raised for the first time in a reply brief." (quotation marks and citation omitted)); *see also Kennedy-Jarvis v. Wells*, 195 F. Supp. 3d 230, 238 n.4 (D.D.C. 2016) (referencing "the D.C. Circuit's admonitions that the [C]ourt need not address an argument raised for the first time in a reply brief" (citing *McBride v. Merrell Dow & Pharm., Inc.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986)).

B.     **Policy and Practice**

The parties first dispute whether DOL, in fact, maintains a policy and practice of ignoring

the prevailing wage requirement when SWAs have not calculated it.  Plaintiffs argue, of course,

that DOL does maintain such a policy.  Dkt. 31 at 16–22.  For their part, Defendants initially

claimed that such a practice did not exist, repeatedly "deny[ing]" in their answer that DOL grants

temporary employment certifications where an SWA does not conduct a wage survey or where

the SWA issues "no finding" as to a prevailing wage rate.  *Compare* Dkt. 1 at 9 (Compl. ¶¶ 28–

30) *with* Dkt. 26 at 5 (Answer ¶¶ 28–30).  Defendants' summary judgment briefing changed

course, however, arguing (1) that the practice of relying on SWAs to provide prevailing wage

data not only exists, but is "longstanding," Dkt. 34-1 at 44–46; (2) that "20 C.F.R. Part 655 has

*never* been read to require every wage source in the offered-wage source provision to always be

available in all situations," *id.* at 44 (emphasis added); and (3) that "[a]s part of the 2010 Rule,

DOL retained . . . its past understanding that if a wage source in the Offered Wage Provision . . .

did not exist, that DOL would set the wage rate at the highest of the other sources," *id.* at 20; *see*

*also id.* at 42 (explaining why "the understanding and practice Plaintiffs now attack has existed

for so long" (internal quotation marks omitted)).

The Court agrees with Plaintiffs (and, it appears, now Defendants) that DOL's policy and

practice is to grant foreign labor certifications even where the prevailing wage has not been

calculated by an SWA.  The agency admits as much, Dkt. 34-1 at 20, 42, 44–46, and the

administrative record supports that concession, Dkt. 30-1 at 68, 72 (DOL PowerPoint

presentation stating that incomplete SWA surveys are "processed [in the] same manner as a

survey with the actual wage"); *id.* at 75–76 (permitting DOL's Agricultural Online Wage Library

to contain "no findings" when SWAs fail to calculate prevailing wage); *see also* Dkt. 31 at 16.

The history of DOL's rulemaking, moreover, unmistakably reflects its policy of granting

certifications absent the calculation of a prevailing wage rate.  In its 2019 NPRM, for example,

DOL explained:

> The Department currently relies on Handbook 385, which pre-dates the creation
> of the H-2A program and was last updated in 1981, to set the standards that
> govern the prevailing wage surveys that the SWAs conduct to establish
> prevailing wage rates for all agricultural job orders. . . .  Due to the difficulty of
> implementing these resource-intensive standards, the SWAs are often required
> to report "no finding" from the prevailing wage surveys that they conduct.  As a
> result, the current survey standards are not only resource-intensive but also fail
> to meet the Department's aim of producing reliable prevailing wage rates.

Temporary Agricultural Employment of H-2A Nonimmigrants in the United States, 84 Fed. Reg.

36,168, 36,179 (proposed rule July 26, 2019) (to be codified at 20 C.F.R. pts. 653 and 655)

(hereinafter "2019 NPRM").  DOL further explained that its proposal would "maintain[] the

requirement that the Offered Wage Rate must be the highest of *applicable* wage sources," *id.*

(capitalization altered and emphasis added), and added that, in line with past practice, DOL was

"not obligated to establish a prevailing wage separate from the AEWR for every occupation and

agricultural activity in every [s]tate," *id.*  DOL's explanations in the 2019 NPRM are consistent

with earlier statements made by the agency—for example, its observation in a 2008 proposed

rule that "agricultural employers wishing to utilize the H-2A program have traditionally been

required to offer and pay their covered U.S. workers and H-2A workers the higher of the

applicable hourly "Adverse Effect Wage Rate" (AEWR), *as determined by the [f]ederal*

*government*; the applicable prevailing wage, *as determined by the [s]tates*; or the [f]ederal or

[s]tate statutory minimum wage."  Temporary Agricultural Employment of H-2A Aliens in the

United States; Modernizing the Labor Certification Process and Enforcement, 73 Fed. Reg. 8538,

8549 (proposed rule Feb. 13, 2008) (to be codified at 20 CFR pt. 655) (emphasis added)

(hereinafter "2008 NPRM").  As DOL stresses, the 2008 NPRM lodged responsibility for

calculating the prevailing wage in "the [s]tates," while expressly tasking "the [f]ederal government" with determining the AEWR.  *Id.*; *see also* Dkt. 34-1 at 44.  Indeed, according to the agency, "ever since the first rulemaking DOL engaged in on the H-2A program and throughout the other rulemakings and guidance DOL has issued related to the H-2A program, the agency has consistently been aware that not every listed wage source would be *applicable* to every application."  Dkt. 41 at 19–20 (emphasis added) (citing Labor Certification Process for the Temporary Employment of Aliens in Agriculture and Logging in the United States, 52 Fed. Reg. 20,496, 20,502 (interim rule final proposed June 1, 1987) (hereinafter "1987 Rule") ("[A] worker in employment under the H-2A program must be paid at the highest of the *applicable* wage rates, whether that highest rate is the AEWR, the prevailing wage, or the [f]ederal or [s]tate statutory minimum wage." (emphasis added)); *see also* Temporary Agricultural Employment of H-2A Aliens in the United States; Modernizing the Labor Certification Process and Enforcement, 73 Fed. Reg. 77,110, 77,115 (final rule Dec. 18, 2008) (to be codified at 20 C.F.R. pt. 655) (hereinafter "2008 Rule") (H-2A workers "will also receive the highest of the AEWR, prevailing wage, or minimum wage, *as applicable*" (emphasis added)).

In light of this all, the Court concludes that no material dispute exists to whether DOL grants foreign labor certifications absent a prevailing wage determination: it does and, apparently, long has.

**B.    Final Agency Action**

Defendants next argue that Plaintiffs' claims are nonjusticiable because they raise a programmatic attack to agency policy as opposed to challenging discrete agency action, and, furthermore, that DOL's policy and practice is not "final" even if it is agency action.  Dkt. 34-1

at 30–37.[5]  This poses an unsettled and difficult question:  Does an agency's policy and practice present justiciable agency action under the APA where a plaintiff does not challenge specific applications of the policy?

Consideration of that question must begin with *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990).  There, the plaintiffs challenged a "land withdrawal review program"— shorthand, the Court explained, for the general "operations of the [Bureau of Land Management] in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans as required by" federal law.  *Lujan*, 497 U.S. at 890.  The Court remarked that the challenged BLM plan was "no more an identifiable 'agency action' . . . than a 'weapons procurement program' of the Department of Defense or a 'drug interdiction program' of the Drug Enforcement Administration."  *Id.*  Such sweeping challenges, the Court held, are typically nonjusticiable:

> [Plaintiffs] cannot seek *wholesale* improvement of [agency] program[s] by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made.  Under the terms of the APA, respondent must direct its attack against some particular "agency action" that causes it harm. . . .  [A] regulation is not ordinarily considered the type of agency action "ripe" for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.

*Id.* at 891.  *Lujan* acknowledged that the "case-by-case approach that [it] require[d] is understandably frustrating."  *Id.* at 894.  But because that approach "is the traditional, and remains the normal, mode of operation of the courts," *Lujan* explained, "[e]xcept where Congress explicitly provides for [judicial] correction of the administrative process at a higher

---

[5]  Plaintiffs originally challenged the grant of five specific labor certifications, *see* Dkt. 1 at 14–15 (Compl. ¶¶ 51–53), but the Court dismissed those challenges as moot, *see Garcia*, 393 F. Supp. 3d at 111.

level of generality, [courts] intervene in the administration of the laws only when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect." *Id.*; *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) ("The limitation [of judicial review] to discrete agency action precludes the kind of broad programmatic attack we rejected in *Lujan*[.]").

A handful of decisions in this circuit have addressed *Lujan*'s applicability to policy-and-practice claims, but those cases do not provide a definitive answer to the question posed here.  In *Cobell v. Norton*, for instance, the D.C. Circuit considered a challenge to the Department of the Interior's High Level Implementation Plan ("HLIP")—a group of projects that the Department had developed to ensure the accuracy of information regarding certain trust accounts and to guide future trust management.  240 F.3d 1081, 1091 (D.C. Cir. 2001).  The district court in *Cobell* had found—and the government had conceded on appeal—that the HLIP constituted justiciable agency action.  *Id.* at 1095.  But this was a "questionable" conclusion, the D.C. Circuit remarked in dicta, because "[w]hile a single step or measure is reviewable, an on-going program or policy is not, in itself, a 'final agency action' under the APA."  *Id.* (citing *Lujan*, 497 U.S. at 890).

More recently, in *Xie v. Kerry*, 780 F.3d 405 (D.C. Cir. 2015), the D.C. Circuit appeared to take a more permissive approach to judicial review of policy-and-practice claims under the APA.  There, the plaintiff alleged that the Department of State was violating the INA's temporal priority provision, 8 U.S.C. § 1153(e)(1), by maintaining an "unannounced policy" that delayed the adjudication of certain Chinese work visas, Dkt. 1 at 9 (Xie Compl. ¶ 28), *Xie v. Kerry*, 21 F. Supp. 3d 89 (D.D.C. 2014) (No. 13-cv-606).  The plaintiff had submitted one such visa to the State Department and sought declaratory relief that the Department's delayed adjudication of it

was unlawful.  *Id.* at 14 (Xie Compl. Prayer for Relief ¶ 2).  But the plaintiff also sought much
more, requesting the court compel the Department's "compl[iance] with the statutory mandate
requiring processing *all immigrant visa cases* in priority date order."  *Id.* at 11 (Xie Compl. ¶ 38)
(emphasis added).

Without distinguishing between the two forms of relief sought, the D.C. Circuit allowed
the plaintiff's suit to go forward.  *Xie*, 780 F.3d at 406.  In response to the contention that the
plaintiff's challenge was overly broad and risked "'injecting the judge into day-to-day agency
management,'" the D.C. Circuit observed that the plaintiff "point[ed] to a precise section of the
INA, establishing a specific principle of temporal priority that clearly reins in the agency's
discretion" and that the plaintiff was "entitled to have [the agency's] current approach
ascertained and its lawfulness adjudicated."  *Id.* at 408 (quoting *Norton*, 542 U.S. at 66–67).  The
D.C. Circuit took a similar approach in *Venetian Casino Resort, LLC v. EEOC*, where it held that
an agency's adoption of "a policy of permitting employees to disclose confidential information
without notice [wa]s surely" the type of action subject to judicial review under the APA.  530
F.3d 925, 931 (D.C. Cir. 2008).

To be sure, neither *Xie* nor *Venetian Casino* addressed whether a plaintiff may bring a
policy-and-practice claim under the APA where the plaintiff did not seek to enjoin or compel a
discrete agency action—such as requiring adjudication of Xie's visa application or enjoining the
disclosure of Venetian Casino's confidential information without notice—but, rather, only
sought to put an end to the practice in all applications.  Nor do any of the district court decisions
wrestle with that question, and, indeed, those decisions take conflicting approaches, some relying

24

on *Cobell* to reject policy-and-practice claims as beyond the reach of the APA,[6] while others

apply *Xie* to reach the contrary conclusion.[7]

Given this uncertainty, and because the Court concludes that Defendants are, in any

event, entitled to prevail on alternative grounds, the Court will not step into this evolving debate.

---

[6]  In the *Cobell* line, *see, e.g.*, *Friends of Animals v. Ashe*, 174 F. Supp. 3d 20, 26, 37 (D.D.C. 2016) (relying on *Cobell* to conclude that plaintiffs' challenge to agency's "'policy and repeated practice' of issuing import permits in violation of the Endangered Species Act" was nonjusticiable where plaintiffs sought "judicial review not only of specific past . . . permitting decisions but also of an alleged 'policy' to grant import permits in the future"); *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 225–26 (D.D.C. 2020) (relying on *Cobell* to conclude that plaintiffs' challenge to Immigration and Customs Enforcement's ("ICE") failure adequately to enforce COVID-19 Pandemic Response Requirements at its detention centers across the country was a nonjusticiable, programmatic challenge); *Arden Wood, Inc. v. USCIS*, 480 F. Supp. 2d 141, 149 (D.D.C. 2007) (relying on *Cobell* to observe in dicta that plaintiffs' suit violated the "prohibition on programmatic challenges" because it challenged the agency's policy with respect to religious worker visas as opposed to challenging a particular visa adjudication (quotation marks and citation omitted)); *RCM Techs. v. DHS*, 614 F. Supp. 2d 39, 42, 46 (D.D.C. 2009) (concluding that plaintiffs' challenge to agency policy "requir[ing] foreign occupational and physical therapists to have master's degrees in order to obtain H–1B visas" nonjusticiable because "[c]ourts stand ready to entertain appeals from specific, concrete agency adjudications[,] [b]ut absent that, courts have neither the resources nor the expertise to superintend agency policy-making"); *Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50–51 (D.D.C. 2014) (relying on *Cobell* to hold nonjusticiable plaintiffs' challenge to "the Forest Service's policies of (1) permitting concessioners to charge fees to visitors who do not use any facilities or services other than parking, and (2) issuing special use permits to such concessioners without undergoing . . . public notice" and other regulatory requirements (quotation marks omitted)).

[7]  In the *Xie* line, *see, e.g.*, *Ramirez v. U.S. ICE*, 310 F. Supp. 3d 7, 20–21 (D.D.C. 2018) (relying on *Xie* to conclude that plaintiffs' challenge to agency policy regarding transfer of immigrant teenagers to adult detention facilities without considering less restrictive placements in violation of 8 U.S.C. § 1232(c)(2)(B) was justiciable agency action); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (finding ICE's policy of considering "an allegedly impermissible factor in making custody determinations" was justiciable agency action); *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 120, 138–39 (D.D.C. 2018) (plaintiffs' challenge to "immigration officials routinely and systematically fail[ing] to abide by a binding, official agency directive governing parole determinations" was justiciable agency action); *Phoenix Herpetological Soc'y, Inc. v. U.S. Fish & Wildlife Serv.*, No. 19-cv-788, 2021 WL 620193, at *2, *6 (D.D.C. Feb. 17, 2021) (rejecting contention that challenge to agency's "alleged practice of acting on permit applications only after a lawsuit was threatened or filed" was a "programmatic attack" because the "alleged policy [was] much more akin to a permissible review of a specific order or regulation, applying some particular measure across the board" (quotation marks omitted)).

If the agency action requirement were jurisdictional, the Court would, of course, need to decide the question before turning to the merits. But it is not,[8] and prudence counsels in favor of deciding the pending cross-motions based on the settled law discussed below. That approach, moreover, will have the added benefit of providing the parties with more meaningful guidance regarding their respective rights and duties. The Court will, accordingly, turn to Plaintiffs' remaining arguments, namely that DOL's ongoing practice is (1) inconsistent with DOL's own regulations; (2) inconsistent with the INA; (3) arbitrary and capricious; and (4) procedurally invalid for failure to go through the notice-and-comment process.[9]

---

[8] *See Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 187 (D.C. Cir. 2006) ("While the [APA's waiver of sovereign immunity in the second sentence of 5 U.S.C. § 702] . . . refer[s] to a claim against an 'agency' and hence waives immunity only when the defendant falls within that category, it does not use either the term 'final agency action' or the term 'agency action.' Nor does the legislative history refer to either limitation. To the contrary, the House and Senate Reports' repeated declarations that Congress intended to waive immunity for 'any,' and 'all' actions for equitable relief against an agency make clear that no such limitations were intended." (citations omitted)); *see also id.* (favorably citing *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989) for the proposition that "the government's attempt to restrict the waiver of sovereign immunity to actions challenging 'agency action' as technically defined in § 551(13) offends the plain meaning of the amendment" (quotation marks omitted)); *Oryszak v. Sullivan*, 576 F.3d 522, 525 n.2 (D.C. Cir. 2009) ("[T]he provision of the APA limiting judicial review to 'final agency action,' 5 U.S.C. § 704, goes not to whether the court has jurisdiction but to whether the plaintiff has a cause of action . . . .").

[9] Defendants also argue that Plaintiffs' claims are time-barred even if justiciable under the APA. Dkt. 34-1 at 37–39. As with the "agency action" argument, the Court need not resolve this issue because the applicable statute of limitations, *see* 28 U.S.C. § 2401(a), is also non-jurisdictional, *see Jackson v. Modly*, 949 F.3d 763, 776 (D.C. Cir. 2020), *cert. denied sub nom. Jackson v. Braithwaite*, No. 20-19, 2020 WL 6829074 (U.S. Nov. 23, 2020) (overruling *Wash. All. of Tech. Workers*, 892 F.3d at 345 n.4) (citing *United States v. Kwai Fun Wong*, 575 U.S. 402 (2015)). Here, irrespective of the statute of limitations, Defendants succeed on the merits.

C.      **Inconsistency with DOL Regulations and the INA**

Plaintiffs devote the bulk of their argument to the contention that Defendants' policy and practice is inconsistent with DOL's own regulations and the INA.  Dkt. 31 at 28–33, 35–36.  The Court is unpersuaded.

1.  *DOL's Regulations*

Plaintiffs first argue that "[t]he plain text of the regulation requires DOL to consider the prevailing wage, with no exceptions."  Dkt. 31 at 29; *see also id.* at 30 ("Although the regulation allows DOL flexibility in *how* it calculates the prevailing wage, the regulation allows DOL no discretion as to *whether* it examines whether an offered wage meets or exceeds the prevailing wage.").  But Plaintiffs never explain why that is so.

Recall that there are three regulatory provisions relevant here.  The Offered Wage Rate provision states:  "To comply with its obligation under § 655.122(l), an employer must offer, advertise in its recruitment, and pay a wage that is the highest of the AEWR, the prevailing hourly wage or piece rate, the agreed-upon collective bargaining wage, or the [f]ederal or [s]tate minimum wage."  20 C.F.R. § 655.120(a).  Section 655.122(l), in turn, provides:  "If the worker is paid by the hour, the employer must pay the worker at least the AEWR, the prevailing hourly wage rate, the prevailing piece rate, the agreed-upon collective bargaining rate, or the [f]ederal or [s]tate minimum wage rate, in effect at the time work is performed, whichever is highest."  *Id.* § 655.122(l).  Finally, the regulations provide that "[t]he criteria for certification include whether the employer has . . . complied with all of this subpart, including but not limited to the . . . offered wage rate criteria in § 655.120."  20 C.F.R. § 655.161(a).

Presumably, Plaintiffs mean to argue that the word "must" as used in § 655.120(a) and § 655.122(l) imposes a nondiscretionary duty on employers to offer and to pay—and thus on

DOL to ensure that employers will offer and pay—an amount equal to at least the highest of the four wage rates, even if no one has calculated or established one or more of those rates.  But as Defendants explain, "not every state has a minimum wage" and not every job has an "agreed-upon collective bargaining wage," Dkt. 41 at 19, and it is thus far from clear how the regulation could operate, or how DOL could go about issuing H-2A certifications, if the word "must" has the meaning that Plaintiffs seek to assign it.  The agency's regulations are supposed to implement the H-2A program, not destroy it.  The Court must read them with that goal in mind.

So viewed, the Court agrees with Defendants that the regulations are best read to require the consideration of the prevailing hourly wage rate if, and only if, that wage has in fact been calculated by an SWA.  This reading of DOL's regulations is most faithful to the relevant text.[10] To start, nothing in the text of the regulations requires that a prevailing hourly wage rate exist as a precondition of certification.  Instead, the regulations merely require that the employer pay "the highest of" the four benchmarks.  20 C.F.R. § 655.120(a).  By definition, however, a benchmark that does not exist cannot exceed any of the other benchmarks, and thus one of the existing benchmarks will necessarily control.  An employer that offers to pay the highest of the existing

---

[10]  Defendants argue that their interpretation of the Offered Wage Rate provision is entitled to *Auer* deference.  Dkt. 34-1 at 46.  But a precondition for *Auer* deference is that the interpretation "must at the least emanate from those actors, using those vehicles, understood to make authoritative policy in the relevant context."  *Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019) (quotation marks omitted)).  Defendants do not explain how this precondition is satisfied.  The latest version of the Offered Wage Rate provision was promulgated in 2010, and Defendants point to no "actors" or "vehicles" codifying their interpretation of the Offered Wage Rate provision.  It is true that the *effects* of the agency's policy and practice are memorialized in written, authoritative documents—namely, the labor certifications that have been granted absent a prevailing wage.  But neither party points the Court to any certification that (1) states, as opposed to assumes, that the agency can grant a certification absent a prevailing wage determination or (2) explains why such a policy and practice is permissible.  "[A]n agency's reading of a rule must reflect fair and considered judgment to receive *Auer* deference," however.  *Kisor*, 139 S. Ct. at 2417 (quotation marks and citation omitted).

benchmarks has thus done all that the regulations demand.  No rational construction of the regulations, for example, would preclude granting a H-2A certification to an employer in the absence of an "agreed-upon collective bargaining wage," *id.*, and nothing in the text of the regulations compels or permits a different conclusion in the absence of a prevailing hourly wage in the relevant jurisdiction.  The regulations, in short, are best read to require payment of the highest of the *existing* benchmarks.

This conclusion finds further support in the regulatory history.  DOL has long derived prevailing wage rates from state-based prevailing wage surveys and acknowledged that its wage-rate requirements mandate only the consideration of extant wage rates.  Dkt. 34-1 at 13–22. DOL's 1987 interim final rule, for example, provided that "a worker in employment under the H-2A program must be paid at the highest of the *applicable* wage rates, whether that highest rate is the AEWR, the prevailing wage, or the [f]ederal or [s]tate statutory minimum wage," and qualified that "the higher prevailing wage rate shall be offered" only "[i]f, *as the result of a [s]tate agency prevailing wage survey determination*, the prevailing wage rate in an area and agricultural activity . . .  is found to be higher that the AEWR."  1987 Rule, 52 Fed. Reg. at 20,502, 20,521 (emphasis added); *see also* Labor Certification Process for the Temporary Employment of Aliens in Agriculture and Logging in the United States, 52 Fed. Reg. 16,770 (proposed rule May 5, 1987) (to be codified at 20 C.F.R. pts. 654 and 655) (proposing the same).

DOL's 1987 Rule remained in effect and largely unchanged until 2008.  Dkt. 31 at 13. That year, DOL "proposed changes to the AEWR methodology . . . but retained the . . . [s]tate-based prevailing wage surveys."  Dkt. 34-1 at 16.  As discussed, the 2008 NPRM acknowledged that "agricultural employers . . . have traditionally . . . pa[id] their covered U.S. workers and H-2A workers the higher of the [AWER], *as determined by the [f]ederal government*; the

applicable prevailing wage, *as determined by the [s]tates*; or the [f]ederal or [s]tate statutory minimum wage."  2008 NPRM, 73 Fed. Reg. at 8549.  The 2008 Rule that resulted likewise "made clear that surveys conducted by SWAs would continue to form the basis of prevailing-wage determinations."  Dkt. 34-1 at 17.

It is true that the 2008 NPRM and 2008 Rule no longer contained the 1987 Rule's requirement that the prevailing wage was to be paid only "[i]f, as the result of a [s]tate agency prevailing wage survey determination, the prevailing wage rate . . . is found to be higher."  *Id.* at 17 n.4.  But the 2008 Rule still defined the prevailing hourly wage to mean "the hourly wage determined by the SWA to be prevailing in the area in accordance with [s]tate-based wage surveys."  2008 Rule, 73 Fed. Reg. at 77,168 (quotation marks omitted).  At no point did the Rule suggest that the federal government bore responsibility to calculate the prevailing wage.  To the contrary, the Rule further explained in response to comments that "SWAs [would] continue an active role in conducting prevailing hourly wage . . . surveys."  *Id.* at 77,121.  And finally, the 2008 Rule made clear that H-2A workers would "receive the highest of the AEWR, prevailing wage, or minimum wage, *as applicable*."  2008 Rule, 73 Fed. Reg. at 77,115 (emphasis added).

In May 2009, DOL suspended the 2008 Final Rule and temporarily restored the prior requirements.  *See* Temporary Employment of H-2A Aliens in the United States, 74 Fed. Reg. 25,972 (final rule May 29, 2009).  DOL then proposed a new rule.  *See* Temporary Agricultural Employment of H-2A Aliens in the United States, 74 Fed. Reg. 45,906 (proposed rule Sept. 4, 2009) (to be codified at 20 C.F.R. pts. 501 and 655) (hereinafter "2009 NPRM").  In it, DOL defined prevailing wage as the "[w]age established pursuant to 20 [C.F.R. §] 653.501(d)(4)."  *Id.* at 45,941.  That change, explained DOL, was intended "to improve clarity and [did] not substantively change the meaning of the term."  *Id.* at 45,909.  Roughly five months later, DOL

published its final rule.  *See* 2010 Rule, 75 Fed. Reg. 6884.  DOL retained the modified

definition of the prevailing wage contained in the 2009 NPRM.  It acknowledged, however, in

response to comments that it had received, that "some states do not perform prevailing wage

surveys, so the Department cannot determine the magnitude of the difference between the

prevailing wage and the AEWR for those States."  *Id.* at 6947.  The 2010 Rule contains no

indication that DOL thought this was a problem, perhaps because, as the Rule recognized,

"[e]vidence suggests that the AEWR would be the highest of the computed wage alternatives,

and therefore binding on employers, in the vast majority of cases."  *Id.* at 6893 n.7; *see also* Dkt.

41 at 22. And finally, the 2010 Rule recognized that its then-new provision requiring employers

to pay a higher prevailing wage rate if that rate increased during the contract period was

"intended to ensure that the workers in the program are consistently receiving at least the highest

of the *applicable* wages."  2010 Rule, 75 Fed. Reg. at 6901 (emphasis added); *see also* Dkt. 41 at

19–20.

The foregoing regulatory history reveals that DOL has consistently employed the

prevailing wage metric by relying on the states.  The 1987 Rule, 2008 NPRM, and 2008 Rule

expressly conditioned the prevailing wage on the existence of state surveys.  And the 2010 Rule

unambiguously provides that DOL's changes to the prevailing wage definition—which removed

the discussion of state surveys—was not intended to effect a substantive change in the regulatory

regime.  Finally, the 2010 Rule recognized that "some states do not perform prevailing wage

surveys" but, nonetheless, did not propose any alternative mechanism for filling this gap. 2010

Rule, 75 Fed. Reg. at 6947.

Against this all, Plaintiffs make two arguments.  First, they argue that DOL's regulations

require DOL to calculate the prevailing wage when SWAs do not.  And second, they contend

that the 2010 Rule's removal of references to state-based wage surveys is "presumed to have real effect in light of well-established interpretive canons." Dkt. 37 at 30 (citing *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 106–07 (1941)).  Both arguments fail.

To start, the existing regulations define "prevailing wage," 20 C.F.R. § 655.103(b), by reference to 20 C.F.R. § 653.501(c)(2)(i) (previously found at 653.501(d)(4)), which states: "SWAs must ensure . . . [that the] wages and working conditions offered are not less than the prevailing wages and working conditions among similarly employed farmworkers in the area of intended employment or the applicable [f]ederal or [s]tate minimum wage, whichever is higher." Given this definition, and in light of the regulatory history, it is challenging to understand how DOL's regulations require the agency, as opposed to SWAs, to calculate the prevailing wage. The regulations provide for just the opposite.

Plaintiffs' next argument—that the Court should give substantive effect to DOL's 2010 revision that removed language from the Rule pertaining to state surveys and the prevailing wage—is similarly misplaced.  The 2009 NPRM, which led to the 2010 Rule, (1) explained that "most of the changes [in the proposed rule were] to improve clarity and [did] not substantively change the meaning of the term;" (2) stated that "[s]ubstantive changes to definitions [were] discussed below;" and (3) finally did not list the change in the prevailing wage definition in the "discuss[ion] below."  2009 NPRM, 74 Fed. Reg. at 45,909–10.  Plaintiffs' argument that the 2010 Rule impliedly rejected the use of state-based surveys for calculating the prevailing wage is thus controverted by the regulatory explanation set forth in the NPRM.

In sum, then, the regulatory history confirms that the Rule permits DOL to grant certifications when the employer advertises and pays at least the highest of any of the four *existing* wage rates.  Neither that history, the Rule's text, nor anything in the broader regulatory

regime requires DOL to calculate the prevailing hourly wage rate itself.  It is even less plausible, moreover, that DOL intended to grant states the power to supplant federal policy regarding the admissibility of foreign workers by merely abstaining from calculating their prevailing hourly wage rates, much less that DOL did so without even mentioning that sweeping delegation of federal authority.  *Cf. Chy v. Freeman*, 92 U.S. 275, 280 (1875) ("The passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States."); *Arizona v. United States*, 567 U.S. 387, 394 (2012) ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens.").

### 2. *INA's Labor Certification Provision*

Plaintiffs next argue that the challenged practice is inconsistent with the INA's requirement that DOL grant foreign labor certifications "only where the certification 'will not adversely affect the wages and working conditions of workers in the United States similarly employed.'"  Dkt. 31 at 35 (quoting 8 U.S.C. § 1188(a)(1)).  Plaintiffs reason that DOL has "acknowledged that there will be scenarios where the prevailing wage exceeds the AEWR and that allowing employers to pay the lower of the prevailing wage and the AEWR would 'disadvantage[]' domestic workers."  *Id.* at 35–36 (quoting 2010 Rule, 75 Fed. Reg. at 6893) (alteration in original).  This argument falls wide of the mark.[11]  Section 1188 says nothing about

---

[11]  The Court notes that although it need not resolve the issue, this aspect of Plaintiffs' attack may well present the type of programmatic challenge precluded by *Lujan*, 497 U.S. at 890–91, and *Norton*, 542 U.S. at 62–66, given the salutary, broad purposes of the INA provision at issue, *see* 8 U.S.C. § 1188(a) ("A petition to import an alien as an H-2A worker . . . may not be approved . . . unless . . . (A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and (B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.").

which wage rates DOL must consider (or determine) before granting a certification. The mere fact that alternative wage metrics *might* lead to higher wages than the AEWR, moreover, does not, without more, demonstrate that the hiring of foreign workers at the AEWR "adversely affect[s] the wages . . . of workers in the United States." 8 U.S.C. § 1188(a)(1). Indeed, it is not difficult to image yet additional measures of wages that are not included, and were never included, in DOL's assessment. No one, including Plaintiffs, contends that the absence of those additional, hypothetical measures violates the INA. Their challenge to DOL's policy and practice as inconsistent with the INA is therefore without merit.

## D.     Arbitrary and Capricious

Plaintiffs also maintain that DOL's practice is arbitrary and capricious for two reasons: first, because it "is contrary to the Offered Wage Rate provision," and second, because it "turn[s] a blind eye to alternative data for determining the prevailing wage in [DOL's] possession, such as the OES survey." Dkt. 31 at 34; *see also* Dkt. 37 at 33–34. The Court has already rejected the first argument, *see* Section III.C.1, *supra*, and for the reasons below, is unpersuaded by the second.

"[T]he arbitrary and capricious standard is 'highly deferential' and 'presumes agency action to be valid.'" *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 245 (D.C. Cir. 2013) (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997 (D.C. Cir. 2008)). An agency rule is arbitrary and capricious, the Supreme Court explained in *State Farm*, when "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed

to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Here, Plaintiffs argue that DOL failed to consider "'reasonably obvious alternatives'" to its current practice of relying on SWAs to provide the prevailing wage, and that that failure renders the agency's extant policy and practice arbitrary and capricious.  Dkt. 31 at 34 (quoting *Multicultural Media, Telecomm. & Internet Council v. FCC*, 873 F.3d 932, 942 (D.C. Cir. 2017) (Millet, J., concurring in part and dissenting in part)).  But contrary to Plaintiffs' argument, DOL acknowledged when promulgating the 2010 Rule that "some states do not perform prevailing wage surveys," and admitted that, as a result, DOL would be unable to "determine the magnitude of the difference between the prevailing wage and the AEWR for those States."  2010 Rule, 75 Fed. Reg. at 6947.  DOL nevertheless declined to develop an alternative prevailing wage metric because, as it explained, "[e]vidence suggests that the AEWR would be the highest of the computed wage alternatives, and therefore binding on employers, in the vast majority of cases." *Id.* at 6893 n.7.  Thus, DOL did not ignore alternative means of calculating the prevailing wage as Plaintiffs contend—it instead reasoned that those metrics would be unnecessary in the mine run of cases.  That decision is not arbitrary and capricious.  *Cf. State Farm*, 463 U.S. at 43 (agency action is arbitrary and capricious where agency "*entirely failed* to consider an important aspect of the problem" (emphasis added)).

## E.  Notice and Comment

Finally, Plaintiffs argue that "DOL did not comply with the notice-and-comment rulemaking procedures mandated by 5 U.S.C. § 553 in adopting the policy and practice challenged here."  Dkt. 31 at 36.  This argument fails as well.

The Court has already concluded that DOL's policy and practice is consistent with the 2010 Rule.  *See* Section III.C.1, *supra*.  DOL's policy and practice thus "merely track[s] preexisting requirements and [effectuates] something the . . . regulation already required." *Mendoza*, 754 F.3d at 1021 (quotation marks, citation, and alteration omitted).  It does not, as legislative rules do, "effect[] a substantive regulatory change to the . . . regulatory regime." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 6–7 (D.C. Cir. 2011) (quotation marks and citation omitted), or "adopt[] a new position inconsistent with existing regulations," *Mendoza*, 754 F.3d at 1021 (citing *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995)). Nor does the policy and practice do more than "confirm a regulatory requirement[] or maintain a consistent agency policy."  *Id.* (quotation marks and citation omitted).  Plaintiffs' challenge to DOL's policy and practice therefore is a challenge to the Rule itself.  Understood as such, Plaintiffs' notice-and-comment claim necessarily falls short, as the 2010 Rule indisputably went through notice and comment.

## CONCLUSION

For the reasons stated, the Court will **GRANT** Defendants' motion for summary judgment, Dkt. 34, and will **DENY** Plaintiffs' motion for summary judgment, Dkt. 31.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 19, 2021